PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-2655
_____

TERRY BROWN, a/k/a ANTONIO LAMBERT

v.

SUPERINTENDENT GREENE SCI;
DISTRICT ATTORNEY PHILADELPHIA;
ATTORNEY GENERAL PENNSYLVANIA

Terry Brown,
                              Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-09-cv-03970)
District Judge: Honorable C. Darnell Jones, II

_____

Argued June 16, 2016

Before: AMBRO, KRAUSE, and NYGAARD, <u>Circuit Judges</u>

(Opinion filed: August 22, 2016)

Leigh M. Skipper
    Chief Federal Defender
 Brett G. Sweitzer
    Assistant Federal Defender, Chief of Appeals
Arianna J. Freeman  (Argued)
    Assistant Federal Defender
Federal Community Defender Office for the
Eastern District of Pennsylvania
601 Walnut Street
The Curtis Center, Suite 540 West
Philadelphia, PA  19106

        Counsel for Appellant

Susan E. Affronti     (Argued)
    Chief, Federal Litigation
Ronald Eisenberg
    Deputy District Attorney, Law Division
George D. Mosee, Jr.
    First Assistant District Attorney
R. Seth Williams
    District Attorney
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA  19107

        Counsel for Appellees

---

OPINION THE COURT

---

AMBRO, Circuit Judge

This case has a familiar cast of characters: two co-defendants, a confession, and a jury. And, for the most part, it follows a conventional storyline. In the opening chapter, one of the defendants (Miguel Garcia) in a murder case gives a confession to the police that, in addition to being self-incriminating, says that the other defendant (Antonio Lambert[1]) pulled the trigger. When Lambert and Garcia are jointly tried in Pennsylvania state court, the latter declines to testify, thereby depriving the former of the ability to cross-examine him about the confession. The judge therefore redacts the confession in an effort to comply with *Bruton v. United States*, 391 U.S. 123 (1968). As a result, when the jury hears Garcia's confession, Lambert's name is replaced with terms like "the other guy." The idea is that the inability to cross-examine Garcia is harmless if the jury has no reason to think that the confession implicates Lambert.

During closing arguments, however, there is a twist when the prosecutor unmasks Lambert and reveals to the jurors that he has been, all along, "the other guy." Now, instead of a conclusion, we have a sequel. Based on a Sixth Amendment violation caused by the closing arguments, we conclude that Lambert is entitled to relief. We therefore

---

[1] In the District Court, Lambert used the name Terry Brown. However, at the time of the crime he went by Lambert, and he uses that name in our Court.

3

remand so that the District Court can give Pennsylvania (the "Commonwealth") the option either to retry or release him.

## I. Background

*A. The crime*

Mary Edmond[2] was shot near a gas station in North Philadelphia on February 23, 2001, and she died later that day from her injuries. The police believed that Lambert pulled the trigger as part of a robbery gone wrong. Earlier in the day, Garcia and his friend Anthony Cheatham had been driving around Philadelphia and smoking marijuana in Garcia's Monte Carlo. With Garcia at the wheel, the pair picked up Lambert, and together the three of them drove to North Philadelphia to buy Xanax pills. Afterward, they drove past the gas station, and Lambert told Garcia to pull over. From that point onward, two competing narratives emerge. One comes from a statement that Cheatham gave the police after the shooting coupled with his testimony at trial. The second is from Garcia's statement to the police, which is at the core of this appeal. We examine each of the narratives in turn.

Cheatham's version is that he fell asleep in the car after taking a Xanax pill. When the trio reached the gas station, he was "[l]aid back, stretched out" in the back seat. Lambert and Garcia got out of the car, and although Cheatham could not see them, he heard a gunshot. When Lambert and Garcia returned to the car, the latter asked, "What the fuck did you just do?" Lambert then pointed a gun at Garcia and ordered him to drive away. Afterward, Lambert and Garcia dropped Cheatham off at a friend's house. Detectives found Cheatham the next morning at his

---

[2] The victim's last name is spelled both "Edmond" and "Edmund" in the record.

4

grandmother's house, and he went with them to police headquarters, where he was threatened with charges if he did not cooperate. He gave a statement at that time and later testified at the joint trial of Lambert and Garcia. He was not charged in connection with Edmond's death.

Garcia, meanwhile, had a different story, which he outlined in a confession[3] to the police. In his version, he stayed in the car while Lambert and Cheatham got out and approached the victim. Garcia saw a "tussle" and witnessed the "lady . . . backing up holding her purse." He continued, "She yanked back, she resisted and I heard a gunshot." When the two companions got back in the car, Lambert said that he had "banged the bitch" because she "wouldn't give up her pocketbook." This was a preview of Garcia's defense at trial, which was that he was merely a bystander to the crime.

Whereas Cheatham's account cut off shortly after the shooting, when he got to his friend's house, Garcia's version described additional events. After dropping off Cheatham, Lambert went with Garcia to the latter's house. Lambert pulled out the gun and told Garcia that "you better not ever cross me or snitch on me because you know what the deal is." Garcia understood this to mean that Lambert would kill him.

After seeing the gun, Garcia's mother asked them to leave. They drove away, and in the early hours of February 24 the two of them, along with another passenger (not

---

[3] Following the lead of the Pennsylvania Supreme Court, we style Garcia's statement a "confession." The statement was self-incriminating because it established his presence at the scene of the crime. We note, however, that it is not a typical confession in that Garcia, as discussed below, intended it to be exculpatory.

Cheatham), were pulled over. Garcia was driving and attempted to flee, but the car crashed. According to Garcia, Lambert threw him the gun and tried to escape on foot. Garcia, now holding the weapon, attempted to do the same. Shortly afterward, officers apprehended both of them.

*B. The trial*

The Commonwealth charged Lambert and Garcia with murder (first degree for the former and second degree for the latter), conspiracy, robbery, and possession of an instrument of crime. It sought a joint trial in state court for the two defendants, and Lambert responded with a motion to sever (*i.e.*, to have a separate trial for each defendant). At the time, it was clear that the Commonwealth intended to use Garcia's confession and that the latter was planning to invoke his Fifth Amendment rights by not testifying at trial. Lambert's counsel argued that the combined effect—the introduction of the confession without any ability to cross-examine Garcia—violated the Sixth Amendment's Confrontation Clause.

The trial judge agreed that the Commonwealth could not, under those circumstances, introduce a full version of Garcia's confession without violating the Confrontation Clause. As discussed in Part III below, that would have been a classic violation of the Supreme Court's *Bruton* decision. However, relying on other Supreme Court decisions interpreting *Bruton*, the judge determined that the confession could be redacted in a way that satisfied the Sixth Amendment, thereby negating the need for separate trials. Under *Bruton*, it is proper for the jury to consider the confession against Garcia; it only becomes problematic to use it against Lambert. If the confession were redacted so that the jury did not know it implicated Lambert, the judge reasoned, the risk of improper use could be contained. On that basis, the judge denied the motion to sever.

6

With severance off the table, the parties discussed how to implement the redactions. They ultimately settled on using terms such as "the other guy," "one of the guys," or "the guy with the gun" to replace Lambert's name in the confession.[4] At trial, a detective read to the jury the redacted confession, which took the form of questions posed to Garcia and his answers. Before the reading, the judge instructed the jurors that the confession "may be considered as evidence only against [Garcia]" and that they "must not consider the statement as evidence against defendant Antonio Lambert." The following is, for our purposes, the key portion of what the jury heard. The italicized phrases are replacements for Lambert's name.

> Q: What happened next?
>
> A: They got in the car and I said what the fuck happened. *One of the guys* said I banged the bitch . . . . She wouldn't give up her pocketbook or nothing, so I banged her. . . . I told *the first guy* what the fuck, you didn't tell me you had a burner.
>
> Q: What is a burner?
>
> A: A gun.
>
> Q: What kind of gun did *the first guy* have?
>
> A: A .38. He showed it to me in my house after he shot the lady. After he shot the lady we went to my house and we went inside. He pulled it out in the kitchen. I told him to put it away because my peoples was [sic] there. My mom

---

[4] Cheatham's name was also replaced with generic identifiers.

told me to get *the guy* out of her house. We left my house and drove down North Philly.

The disparities between the statements of Cheatham and Garcia proved to be a delicate needle for the Commonwealth to thread. It encouraged the jury to believe Cheatham's statement in its entirety and to credit all of Garcia's story except for the part where he remained in the car during the shooting while the other two got out. During closing arguments, when the prosecutor was attempting to discredit Garcia's insistence that he did not get out of the car with Lambert, she made the following statement:

If Garcia had not been part of what happened, how easy would it have been for him to drop Lambert off, go home, tell his mother what happened, pick up the phone and call the police and say I was just with a guy who shot and killed somebody? He doesn't do that. What does he do [sic] is this, he takes Lambert to his house. They're at his house and he says the guy I'm with brings the gun into my house and I tell him put it away because my people are there.

Defense counsel, believing that this statement had effectively nullified one of the redactions and unmasked Lambert as the person who accompanied Garcia home after the shooting and pulled out the murder weapon, immediately requested a sidebar, but the judge permitted closing arguments to continue. After the prosecutor finished, defense counsel moved for a mistrial, explaining:

The reason for [the] mistrial is Your Honor will recall that the Court and counsel went through painstaking efforts to properly redact Mr. Garcia's statement and one of the first things

8

[the prosecutor] did is whip it out and read from it and tell the jury that Mr. Garcia took Mr. Lambert back to his house with the gun and read the entire portion of that statement implicating Mr. Lambert as the other guy. In fact, [she] told the jury that Mr. Lambert was the other guy.

The judge denied the motion. Having lost his request for a mistrial, defense counsel followed up by asking the judge to instruct the jury to disregard the unmasking, but he later abandoned the request after deciding that rehashing the incident might reinforce in the jurors' minds the idea that Lambert was the other guy.[5]

Before sending the jury to deliberate, the judge reiterated the instruction given before the redacted confession was read into evidence: that it could only be used against Garcia and must not be considered as evidence against Lambert. Per defense counsel's request, the judge did so without calling attention to the slip-up during closing

---

[5] The statement about Lambert going home with Garcia and brandishing the gun was not the only time the prosecutor used the confession against Lambert during closing arguments. At another point, she said: "It's an old ugly gun, but it worked. It killed Mary Edmond. It did just what Antonio Lambert wanted it to do. He managed to shoot her. Why? Because she didn't give up her pocketbook. She resisted it. And that's exactly what Mr. Garcia said in his statement." As discussed below, however, this second instance has not been a focus of the post-trial litigation. As such, unless otherwise noted, all references to comments by the prosecutor during closing arguments pertain to the remarks about Lambert accompanying Garcia home and pulling out the weapon.

arguments. During deliberations, the jurors asked for a copy of Garcia's confession. Instead of giving it to them, the judge had the court reporter read the redacted version. Ultimately, the jury convicted Lambert on all counts. Meanwhile, it found Garcia guilty of all charges except the weapon-related count.

*C. Post-trial proceedings*

Lambert appealed his conviction to the Pennsylvania Superior Court. He argued that the trial judge erred by denying the motion to sever and that, even if a joint trial were proper, the comments in the closing arguments constituted prosecutorial misconduct and deprived him of his Confrontation Clause rights. A panel of the Court unanimously agreed with both arguments and ordered a new trial. The Commonwealth appealed to the Pennsylvania Supreme Court, which reversed the Superior Court by a 3-2 vote.

In the Pennsylvania Supreme Court's decision, the majority rejected the argument that the trial judge was required to grant Lambert's motion to sever. It wrote that the redactions obviated the need for separate trials because Garcia's confession "as redacted did not identify [Lambert], or his role, at all." *Commonwealth v. Brown*, 925 A.2d 147, 163 (Pa. 2007). On that basis, it determined that the jury should be presumed to have obeyed the judge's instructions to use the confession as evidence only against Garcia.

Similarly, the majority disagreed with the Superior Court's conclusion that the prosecutor's comments during closing arguments made a new trial necessary. It agreed with Lambert that "[t]here is no point in redacting and sanitizing otherwise inculpatory statements of a non-testifying co-defendant, to facilitate a joint trial, if that protective measure approved by the [U.S. Supreme] Court to comport with the

10

Confrontation Clause could be deliberately and directly undone by lawyer commentary." *Id.* at 159. And the majority stressed that it did "not condone the prosecutor's misstatement." *Id.* at 160. However, it relied on the U.S. Supreme Court's decision in *Frazier v. Cupp*, 394 U.S. 731 (1969), to conclude that the trial judge's instructions about how the confession could (and could not be) used were sufficient and that a new trial was not necessary. We discuss *Frazier,* as well as the majority's reliance on it, in detail in Parts III and IV of this opinion.

In a dissent joined by then-Chief Justice Cappy, Justice Baer wrote that the comments during closing arguments violated the Confrontation Clause and that the jury should be considered incapable of following the instructions not to use the confession against Lambert. He wrote that a "defendant is . . . deprived of his rights under the Confrontation Clause if an otherwise effective redaction is corrupted by a prosecutor's comment[s]." *Brown*, 925 A.2d at 164 (Baer, J., dissenting). He noted that under *Bruton* Lambert would have gotten a new trial (and the limiting instructions would have been considered inadequate) if Garcia's confession had been read to the jury without redactions. Justice Baer concluded that it would be anomalous to reach a different result when a prosecutor undoes a redaction by revealing the identity of the person whose name was removed. He admonished that "this Court should not admit a violation of the fundamental right of confrontation and cross-examination by means of a back-door revelation, when *Bruton* so carefully guards the front door." *Id.* at 166.

After unsuccessfully seeking relief under Pennsylvania's Post Conviction Relief Act, Lambert filed a *pro se* federal habeas petition in the District Court under 28 U.S.C. § 2254. He raised the severance and prosecutorial misconduct arguments rejected by the Pennsylvania Supreme

11

Court, as well as a second prosecutorial misconduct claim and certain claims of ineffective assistance of counsel. The Court denied the petition. It rejected the arguments not presented to the Pennsylvania Supreme Court (ineffectiveness of counsel and the second claim of prosecutorial misconduct) on procedural grounds. Meanwhile, it denied relief on the merits on the two issues—severance and the first prosecutorial misconduct claim—considered by the Pennsylvania Supreme Court. We granted a certificate of appealability as to these two claims and appointed counsel to represent Lambert.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 2254, and we have appellate jurisdiction per 28 U.S.C. §§ 1291 and 2253. We exercise plenary review over the District Court's legal conclusions. *Werts v. Vaughn*, 228 F.3d 178, 191 (3d Cir. 2000).

Like that Court, our task is to review a state court decision. As such, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") also bears on our analysis. Under AEDPA's deferential standard of review, if a claim was "adjudicated on the merits in State court proceedings," we can grant relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U.S.C. § 2254(d). The decision that gets AEDPA deference is the "last reasoned [one] of the state courts on the petitioner's claims." *Simmons v. Beard*, 590 F.3d 223, 231–32 (3d Cir. 2009) (internal quotation marks omitted). Here that is the Pennsylvania Supreme Court's reversal of the Superior Court's judgment. Because no facts are in dispute, the Pennsylvania Supreme

12

Court's decision must stand unless it was "contrary to" or an "unreasonable application of" clearly established federal law.

We can grant relief under the "contrary to" standard only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Meanwhile, a decision from a state court "is an unreasonable application of [the Supreme Court's] clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014). In this context, an "unreasonable application . . . must be objectively unreasonable, not merely wrong; even clear error will not suffice." *Id.* at 1702 (internal quotation marks omitted).

Additionally, a state court applying Supreme Court cases has no obligation to extend their rationales. *Id.* at 1706. At the same time, "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (internal quotation marks omitted). Rather, "state courts must reasonably apply the rules squarely established by [the Supreme] Court's holdings to the facts of each case." *White*, 134 S. Ct. at 1706 (internal quotation marks omitted). In determining whether they have done so, we are guided by the specificity of the Supreme Court rule they are applying. Under that metric, the "more general the rule, the more leeway [state] courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

Even if we conclude that a state court decision is improper under these standards, we must also examine

whether the error was harmless. An error-infected state court conviction can stand on habeas review if the mistake did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Bond v. Beard*, 539 F.3d 256, 276 (3d Cir. 2008) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)) (internal quotation marks omitted). Because the Pennsylvania Supreme Court denied relief on the merits without addressing harmlessness, there is no ruling on that subject to which we must defer. As a result, our harmlessness review is plenary. *See Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015); *Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).

### III. *Bruton* and Its Progeny

The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. And a "major reason underlying [this] rule is to give a defendant charged with [a] crime an opportunity to cross-examine the witnesses against him." *Pointer v. Texas*, 380 U.S. 400, 406–07 (1965). Occasionally, however, the right to cross-examine runs headlong into another constitutional right: the Fifth Amendment's protection against self-incrimination. *See* U.S. Const. amend. V (providing that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself").[6] A classic example is our situation here. The Sixth Amendment gives Lambert the right to cross-examine Garcia about his confession, but the Fifth Amendment allows Garcia to refuse to take the stand. The Supreme Court has dealt with different

---

[6] The Confrontation Clause and the privilege against self-incrimination both apply to proceedings in state courts. *See Cruz v. New York*, 481 U.S. 186, 189 (1987) (Confrontation Clause); *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (self-incrimination).

variations on this theme, and four of its decisions—*Bruton*; *Frazier*; *Richardson v. Marsh*, 481 U.S. 200 (1987); and *Gray v. Maryland*, 523 U.S. 185 (1998)—guide our analysis. We discuss each in turn.

In *Bruton*, two defendants (Evans and Bruton) were tried together for an armed postal robbery. Evans, who had given a confession that also implicated Bruton, opted not to take the stand, but the jury heard his confession in full, unredacted form through a postal inspector's testimony. The trial judge instructed the jury that the confession could be used against Evans but not against Bruton. The Supreme Court held that the reading of the confession was a Confrontation Clause violation and that limiting instructions were incapable of curing it. 391 U.S. at 135–36.

It based its conclusion on the cognitive dissonance that results from asking jurors to consider a confession only against one defendant. It wrote that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. It continued:

> Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame

15

onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

*Id.* at 135–36 (footnote omitted).

The next year, the Court decided *Frazier*, which involved two cousins (Frazier and Rawls) who were jointly indicted. Rawls pled guilty and gave a confession that also incriminated Frazier, who elected to proceed to trial. Though Frazier's lawyer told the prosecutor that Rawls intended to invoke the Fifth Amendment if called, the prosecutor believed he would cooperate and previewed his expected testimony to the jury. That "summary [of the expected testimony] was not emphasized in any particular way," and it "took only a few minutes to recite." 394 U.S. at 733. After Rawls eventually asserted the Fifth Amendment, Frazier argued that there was a *Bruton* violation because the substance of the incriminating statement had been put in front of the jury without an opportunity for cross-examination. The Court disagreed and concluded that, unlike in *Bruton,* limiting instructions "were sufficient to protect [Frazier's] constitutional rights." *Id.* at 735. Importantly, at no point during the trial was the jury read Rawls' confession. Rather, it only heard the outline of what Rawls was expected to say if he testified.

In rejecting Frazier's argument, the Court highlighted four differences between that case and the typical *Bruton* scenario. First, the jury was exposed to a paraphrased version of Rawls' account rather than a verbatim confession. *Id.* Second, the account was introduced during opening statements rather than through witness testimony. *Id.* Third, only one defendant was on trial, so the "jury was not being

16

asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial." *Id.* And finally, "Rawls' statement was not a vitally important part of the prosecution's case." *Id.*

The Court noted that it is common for a party not to be able to produce all the evidence promised in an opening statement and that "[c]ertainly not every variance between the advance description and the actual presentation constitutes reversible error . . . when a proper limiting instruction has been given." *Id.* at 736. However, it "may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable." *Id.*

Next up is *Richardson*. At a joint trial for co-defendants Marsh and Williams, the prosecution introduced the latter's confession. Williams did not testify, and the judge instructed the jury not to use his confession against Marsh. The confession recounted, among other things, an incriminating conversation that took place in a car carrying Marsh, Williams, and Martin (who was charged alongside the other two but was a fugitive at the time of trial). Unlike in *Bruton*, however, the confession was redacted before being read to the jury. The redactions did not, as did ours, merely replace the other defendant's name with generic terms. Rather, the confession "was redacted to omit all reference" to Marsh or her role in the crime. 481 U.S. at 203. Thus, the version that the jury heard placed Martin and Williams in the car but did not mention a third person being there.

The potential problem arose when Marsh took the stand and testified that she was in the car with Martin and Williams. Her argument was that, although Williams' redacted confession did not implicate her on its own, the combination of the confession (which described an

17

incriminating conversation in the car) and her testimony (which put her in the car) created an intolerable risk that the jury would be unable to follow the limiting instruction. In other words, the concern was that the jury impermissibly would use the confession against her by determining that she heard the conversation.

The Court rejected this argument, concluding that when a "confession [is] not incriminating on its face" toward a co-defendant and "bec[omes] so only when linked with evidence introduced later at trial," it is "a less valid generalization that the jury will not likely obey the [limiting] instruction." *Id.* at 208. As a result, it is presumed able to consider the confession to determine the speaker's, but not the co-defendant's, guilt. The Court summarized its holding as follows: "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.

That holding, however, did not end the case. That is because, during closing arguments, the prosecutor encouraged the jury to do precisely what Marsh feared would happen and what the limiting instruction was meant to avoid—to assume, based on the combination of the confession and her testimony, that she heard the incriminating conversation. The Court described this as seeking "to undo the effect of the limiting instruction" and called it an "error." *Id.* Because Marsh's lawyer did not object to the prosecutor's comments, the Court remanded for a determination of whether they nonetheless could serve as a basis for relief. *Id.*

The final piece of the puzzle is *Gray*, which falls somewhere between *Bruton* and *Richardson*. As in *Richardson* and unlike in *Bruton*, the confession was

redacted. But whereas the redactions in *Richardson* removed all reference to the co-defendant's existence, the co-defendant's name in *Gray* merely was replaced with a blank space or the word "deleted." For instance, the jury heard that "Me, deleted, deleted, and a few other guys" committed a crime. 523 U.S. at 196. The Court held that, when a name is replaced "with an obvious indication of deletion," *Bruton* applies and no limiting instructions can be sufficient. *Id.* at 192.

It noted that, as in *Richardson*, the jury would need to make inferences for the confession to become incriminating (in *Richardson* by linking the confession to testimony and in *Gray* by divining the identity of the blanked-out name). However, it concluded that "inference pure and simple cannot make the critical difference, for if it did, then *Richardson* would also place outside *Bruton*'s scope confessions that use shortened first names, nicknames, descriptions as unique as the 'red-haired, bearded, one-eyed man-with-a-limp,' and perhaps even full names of defendants who are always known by a nickname." *Id.* at 195 (citation omitted). Maintaining that its approach was not overly burdensome, the Court implied that it might have been permissible to replace "Me, deleted, deleted, and a few other guys" (the example from above) with "Me and a few other guys," thereby making the inference less obvious. *Id.* at 196.

In sum, there are some cases (*Bruton* and *Gray*) where no limiting instruction can cure the harm that comes from the jury's exposure to an incriminating confession. Meanwhile, in other situations (*Frazier* and *Richardson*) we can assume that the jury is capable of following instructions. We must now consider on which side of the line our case falls.

## IV. The *Bruton* Violation in Lambert's Trial

Lambert has two arguments for why his trial violated *Bruton*. First, he contends that it and its progeny required severance of his trial from Garcia's. He claims this is a straightforward application of our *Bruton*-based decisions in *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008); *Eley v. Erickson*, 712 F.3d 837 (3d Cir. 2013); and *Washington v. Sec'y Pa. Dep't of Corr.*, 801 F.3d 160 (3d Cir. 2015). Next, he asserts that, even assuming a joint trial was permissible, a *Bruton* violation occurred during closing arguments because of the prosecutor's comments. He labels this a prosecutorial misconduct claim.[7] We agree with this second argument and conclude, without deciding whether the denial of the severance request was proper, that the comments during closing arguments violated *Bruton*.

---

[7] At the outset of this appeal, there appeared to be disagreement about whether this claim is properly before us. "Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). To ensure that state courts have this opportunity, the petitioner's claims must be "fairly presented" to them. *Picard v. Connor*, 404 U.S. 270, 275 (1971). This means that the petitioner must put before the state courts the "substantial equivalent" of the claims pursued in federal court. *Id.* at 278. In his brief, Lambert, in addition to arguing that the prosecutor's comments violated *Bruton*, also invoked the Supreme Court's standards for prosecutorial misconduct from *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974), and *Darden v.*

We start from the undisputed premise, stated by the Pennsylvania Supreme Court, that "[t]here is no point in redacting and sanitizing otherwise inculpatory statements of a non-testifying co-defendant, to facilitate a joint trial, if that protective measure approved by the [U.S. Supreme] Court to comport with the Confrontation Clause could be deliberately and directly undone by lawyer commentary." *Brown*, 925 A.2d at 159. Indeed, the Pennsylvania Supreme Court conceded that, under the right circumstances, there could be a *Bruton* violation based on an "argument by counsel concerning *Bruton*-redacted evidence." *Id.* at 160. As an example, it imagined a scenario where a prosecutor tells the jury: "You heard the co-defendant's confession, which also described the actions of someone he identified only as 'the other guy;' well, I'm here to tell you that 'the other guy' he was speaking of was the defendant and we just changed the wording of the statement." *Id.* at 159 (internal quotation marks omitted).

The Pennsylvania Supreme Court is correct, of course, that those circumstances would violate *Bruton*. Were it

*Wainwright*, 477 U.S. 168 (1986). Those cases held that improper comments by prosecutors result in constitutional error when they "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643) (internal quotation marks omitted). The Commonwealth correctly notes that Lambert did not present an argument based on this standard to the state courts. However, as discussed below, we resolve this claim based only on *Bruton* and its progeny. Because the Commonwealth agreed at oral argument that a *Bruton*-based attack on the prosecutor's comments was in front of the state courts, the fair presentation requirement does not create any obstacles here.

otherwise, *Bruton* would mean little. There would be no point in redacting confessions only to have the identities of the co-defendants blatantly unmasked. And we know from *Gray* that *Bruton* is not so easily defeated. Otherwise, the Supreme Court would not have gone out of its way to say that *Bruton* cannot be circumvented by replacing somebody's name with an obvious identifier (such as the "red-haired, bearded, one-eyed man-with-a-limp"). *Gray*, 523 U.S at 195 (internal quotation marks omitted). Indeed, we discern no difference in effect between the situation in *Bruton*, where the jury heard an unredacted statement naming the co-defendant, and one where the jury hears a redacted statement but is later told to whom the redactions refer.

If there were any doubt as to the applicability of *Bruton* to the Pennsylvania Supreme Court's hypothetical, *Richardson* eliminated it. On the one hand, *Richardson* made clear that a properly redacted confession does not violate the Confrontation Clause when linked with other admissible evidence. Yet it also established that a prosecutor's inadmissible use of a confession during closing arguments runs afoul of *Bruton*. That is because it is "error" for a prosecutor "to undo the effect of the limiting instruction." 481 U.S. at 211.

We part company, however, with the Pennsylvania Supreme Court with regard to the three attempts it made to distinguish our case from its hypothetical example. First, it implied that a prosecutor's unmasking of a co-defendant must be done "deliberately" for *Bruton* to come into play. *Brown*, 925 A.2d at 159. Any such requirement of intentional conduct would be contrary to clearly established Supreme Court law. Specifically, the Court in *Frazier* said that "we do not believe that the prosecutor's good faith, or lack of it, is controlling in determining whether a defendant has been deprived of the right of confrontation." 394 U.S. at 736. Here, though there is

22

no evidence that the prosecutor acted in bad faith, that is irrelevant for constitutional purposes. Indeed, the Commonwealth conceded (as it must) during oral argument before us that the Pennsylvania Supreme Court erred by suggesting that intent matters.

Second, we disagree that the statement needs to be as conspicuous as the example presented by the Pennsylvania Supreme Court, where the prosecutor tells the jury that the confession had been redacted and had previously included the co-defendant's name. During closing arguments, the prosecutor revealed that Garcia took Lambert to his house, where the latter pulled out the murder weapon. Thus, the prosecutor's comments conveyed a message—that Lambert was the person whose name was withheld in the redacted confession—as clearly as would have been the case in the example used by the Pennsylvania Supreme Court.[8]

---

[8] If there had been other evidence that Lambert went home with Garcia and took out the murder weapon, the prosecutor properly could have relied on that in closing arguments as long as she did not also encourage the jury to use the redacted confession against Lambert. The Commonwealth argues that this is the case here. It says that the prosecutor was not undoing the redactions but instead was encouraging the jury to draw inferences from other evidence in the record. However, the Pennsylvania Supreme Court rejected this argument and found that "Garcia's statement was the only source suggesting that Garcia took [Lambert] to his house." *Brown*, 925 A.2d at 156 n.5. Under AEDPA, this factual determination is "presumed to be correct," 28 U.S.C. § 2254(e)(1), and there is no reason here to set aside that presumption.

Moreover, *Richardson* forecloses the Pennsylvania Supreme Court's analysis. As discussed, a redacted confession in that case described a conversation that took place in a car, and Marsh admitted that she was in that same car. The prosecutor put these two facts together in closing arguments and asked the jury to draw the inference that Marsh heard the conversation. That is much less direct than our case, where the prosecutor did more than merely argue an inference and instead recounted the confession as though Lambert's name had been in it all along. Though the prosecutor in *Richardson* did not unmask Marsh as a passenger in the car—Marsh did that herself through her testimony—the Court nonetheless found a Confrontation Clause error. 481 U.S. at 211. The only reason why the Court remanded rather than granting relief directly was the failure of defense counsel to object during closing arguments—a failure not present here.

In terms of applying this clearly established Supreme Court precedent, our opinion in *Vazquez* provides useful guidance.[9] There, as here, the prosecutor, without going so far as telling the jury that the confession had been redacted to omit the co-defendant's name, "effectively eliminated the redaction" through a slip of the tongue during closing

---

[9] We do not rely on *Vazquez* as having created clearly established law, as only Supreme Court cases can do that for AEDPA purposes. Rather, we look to it to determine the principles that we have determined previously to be clearly defined by Supreme Court cases. *Cf. Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (noting that "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent").

24

arguments while paraphrasing the confession. 550 F.3d at 275. Though we granted relief on other grounds, we also interpreted *Bruton* to leave "no doubt" that the comments during closing arguments were "a grave and probably fatal constitutional violation." *Id.* at 283 n.14. There was "no difference between the admission of [the] unredacted statement" at the outset and a situation where the prosecutor negates the redactions during arguments. *Id.*; *see also Fowler v. Ward*, 200 F.3d 1302, 1311 (10th Cir. 2000) (noting that it would "squarely violate[]" the Confrontation Clause even to "suggest" that a redacted confession implicated a co-defendant), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000).

Finally, we disagree with the Pennsylvania Supreme Court's reliance on *Frazier* as a means of escaping *Bruton*'s command. As discussed, the Court in *Frazier* gave four reasons for its conclusion. None apply here. The first and second factors are that the prosecutor in *Frazier* 1) summarized a confession that 2) was never actually read—redacted or otherwise—to the jury. Here the jury heard a full reading of the redacted confession and then had the redactions compromised during closing arguments. This difference is critical. The task of the jury in *Frazier* was merely to pretend that there was no confession. By contrast, the jury here was asked to consider the confession, but only against Garcia, when the prosecutor effectively said during closing arguments that it also implicated Lambert. That is the situation *Bruton* describes as "intolerabl[e]." 391 U.S. at 136.

Meanwhile, the third *Frazier* factor—that there was only one defendant on trial, so the "jury was not being asked to perform the mental gymnastics of considering an incriminating statement against only one of two defendants in a joint trial," 394 U.S. at 735—is not present here because there was a joint trial and jurors were told that they had to

25

limit their use of the confession to one defendant. Once again, this places us squarely within *Bruton* and its warning that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." 391 U.S. at 135.

The final factor in *Frazier* was that the evidence was not "vitally important" to the prosecution's case. 394 U.S. at 735. As discussed below in explaining why the error was not harmless, the evidence here was crucial to the Commonwealth's case.

Properly understood, then, *Frazier* does not carry the day for the Commonwealth. *Frazier* made clear that not all mistakes in opening or closing statements are *Bruton* violations. But it never said (or even implied) that *Bruton* has a back door that allows prosecutors to do what the Supreme Court has expressly forbidden—dangle an incriminating statement in front of jurors, tell them it implicates a particular defendant, and then expect that they will not use it against that person.

We therefore hold, as a matter of clearly established Supreme Court law, that the prosecutor's comments violated the Confrontation Clause. There are some circumstances when the prosecution can commit what otherwise would be a constitutional violation but nonetheless escape a mistrial through limiting instructions. However, in cases falling within the ambit of *Bruton* and its progeny, limiting instructions cannot cure the error. *See Bruton*, 391 U.S. at 135–36. This is such a case. In deciding otherwise, the Pennsylvania Supreme Court acted contrary to U.S. Supreme Court law by apparently requiring prosecutors to act in bad faith for

26

protections to arise, and it misapplied *Bruton*, *Frazier*, *Richardson*, and *Gray* by not requiring a mistrial.

## V. Harmlessness

Having found an error, we next consider whether it was harmless. To determine whether the *Bruton* violation had a "substantial and injurious effect or influence" on the outcome, *Bond*, 539 F.3d at 276 (internal quotation marks omitted), we must look at the evidence that the jury properly could have considered against the defendant. Here the Commonwealth's case against Lambert rested almost entirely on Cheatham's testimony. Indeed, Cheatham was the only witness with admissible testimony about what Lambert did at the gas station. And, because Garcia had the gun at the time of the arrest, Cheatham provided the only admissible link between Lambert and the murder weapon. But, as noted below, Cheatham had substantial flaws as a witness. Hence we conclude that the *Bruton* error was not harmless.

Cheatham's own testimony undercut his reliability and usefulness as a witness. By his own admission, he was impaired from marijuana and Xanax. As a result, he was asleep shortly before the crime. And, more importantly, he said he stayed in the back seat the whole time. His most powerful statement is that he saw Lambert and Garcia get out of the car and, when they got back in, Lambert pointed a gun at Garcia and ordered him to drive. But Cheatham never claimed to witness the robbery or the murder as they took place.

Another red flag is that Cheatham added key details to his narrative between when he gave a statement to the police and when he testified. For instance, the part about Lambert pointing the gun at Garcia emerged for the first time in court. During cross-examination, Cheatham admitted that he had not

27

included that detail when talking to detectives the day after the crime.

And Cheatham had a powerful motive to implicate Lambert. The former escaped charges by convincing detectives that he had remained in the car while Lambert and Garcia got out. Garcia was telling an entirely different story in which he was merely present for a crime committed by Lambert and Cheatham. And Cheatham only gave his statement after being told he would be charged with a crime if he did not cooperate. This would give the jury reason to view Cheatham's testimony skeptically.

The Commonwealth admits that Cheatham is a flawed witness but gives us three reasons why it thinks the error was nonetheless harmless. They do not persuade us. First, it argues that the convictions of both Lambert and Garcia mean that the jury must have believed Cheatham (despite his weaknesses) and disbelieved Garcia. The consequence, in the Commonwealth's view, is that it would not matter if it became obvious that the redacted confession implicated Lambert because the jury rejected Garcia's narrative.

We agree that the jury, in convicting Garcia, apparently credited Cheatham's account that Lambert and Garcia got out of the car rather than Garcia's story that Lambert and Cheatham did so. But it does not follow that the jurors necessarily disbelieved the other portions of Garcia's confession that implicated Lambert as the shooter. These parts, which the jury was not supposed to use against Lambert, reinforced rather than contradicted Cheatham's spotty testimony. Hence we cannot say that the jury, once aware during closing arguments that Garcia's confession

incriminated Lambert, did not make significant use of that information.[10]

Next, the Commonwealth notes that the unmasking of Lambert happened during a part of the closing arguments when the prosecutor was asking the jury to find Garcia guilty. Specifically, she was discussing Garcia's story that Lambert and Cheatham committed the crime. If that were true, the prosecutor asked, why did Garcia bring one of the criminals to his home afterward rather than dropping him off and calling the police? It was in this context that she used Lambert's name, rather than a generic identifier, and revealed that he was the one who went home with Garcia. Essentially, the Commonwealth's argument is that, based on the structure of the closing arguments, the jury would not have been tempted to use the information against Lambert. However, as discussed below, the information was quite harmful to Lambert, and we cannot realistically assume that the jury ignored it.

The Commonwealth's final argument is that the details that the prosecutor improperly revealed—Lambert accompanying Garcia home and pulling out the gun—did not add much to the case against Lambert because they related to events after the shooting. That misses the point. If the redactions were ever effective—a question we do not decide—it would be because they effectively encrypted the confession by obscuring from the jury part of its meaning. During closing arguments, the prosecutor essentially gave the

---

[10] The jury's request to see the confession during deliberations also lends possible support to the notion that jurors relied on it to convict Lambert. Nonetheless, we do not know what motivated the request, and we need not give it any particular import in reaching our conclusion.

jury the key to break the encryption. And, in doing so, she revealed far more to the jury than Garcia's statement that Lambert came home with him.

As noted above but repeated here for convenience, the key portion of the confession (with the replacements shown in italics) is:

> Q: What happened next?
>
> A: They got in the car and I said what the fuck happened. *One of the guys* said I banged the bitch . . . . She wouldn't give up her pocketbook or nothing, so I banged her. . . . I told *the first guy* what the fuck, you didn't tell me you had a burner.
>
> Q: What is a burner?
>
> A: A gun.
>
> Q: What kind of gun did *the first guy* have?
>
> A: A .38. He showed it to me in my house after he shot the lady. After he shot the lady we went to my house and we went inside. He pulled it out in the kitchen. I told him to put it away because my peoples was [sic] there. My mom told me to get *the guy* out of her house. We left my house and drove down North Philly.

Once the jury knew that Lambert was the person who went to Garcia's house, it could follow the story backward to learn that Lambert was the one with the "burner" and was therefore the person who shot the victim. We are thus unconvinced by the

30

Commonwealth's attempt to minimize the importance of the unmasking.

Lambert has argued in federal court that the harmfulness of the error was compounded by the prosecutor's flouting of the redactions at another point in her closing arguments. As discussed, *see supra* n.5, apart from the comments about Lambert accompanying Garcia home, she also told the jury: "It's an old ugly gun, but it worked. It killed Mary Edmond. It did just what Antonio Lambert wanted it to do. He managed to shoot her. Why? Because she didn't give up her pocketbook. She resisted it. And that's exactly what Mr. Garcia said in his statement." The Commonwealth says that this argument is procedurally defaulted because Lambert did not explicitly reference these other remarks in state court. However, we need not weigh in because, for the reasons we have explained above, we conclude that the error would not have been harmless even if the prosecutor had not made these other comments.

Ultimately, given the significance of Garcia's confession to the Commonwealth's case, Cheatham's potential unreliability, and the absence of other evidence identifying Lambert as the shooter, we believe that the prosecutor's unmasking of him as "the other guy" had a "substantial and injurious effect" and that relief is therefore warranted. *Bond*, 539 F.3d at 276 (internal quotation marks omitted).

## VI. Conclusion

We expect that this case will be the exception rather than the norm. The potential for constitutional error could have been mitigated at the outset by

31

granting the motion to sever the trials. After settling on a joint trial, the Commonwealth could have, during closing arguments, guarded more carefully against the special risks posed by redacted confessions. Having failed to do so, it nonetheless could have avoided a mistrial had the mistake been of the variety that *Frazier* says can be cured through limiting instructions. And even after missing these first three safety valves, the Commonwealth could have escaped this result had the error been harmless.

Here, however, the prosecutor's comments created a *Bruton* violation that was not harmless. We therefore reverse the order of the District Court and remand with instructions for it to grant Lambert's petition and require the Commonwealth either to release him or retry him within a specified and reasonable time period.