IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 79906-1-I (Consolidated with No. 80540-1-I) |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| JONATHAN WAYNE KEY, JR., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — A jury convicted Jonathan Key of burglary in the first degree following a joint trial with his codefendant, Robert Willis. Key appeals, alleging a violation of his constitutional right to confront witnesses against him, arguing that the prosecutor improperly urged the jury to use Willis's out-of-court statements as evidence of his guilt. He also contends that counsel's representation was constitutionally inadequate in several respects and seeks resentencing based on the State's failure to submit proof of his criminal history. We affirm Key's conviction, but remand for resentencing.

FACTS

In August 2018, Tom Dykstra left his Bellevue, Washington home with his spouse for a vacation in Hawaii. Before leaving, Dykstra informed his neighbors, Guang "Allen" Wang and Peichum Tsai, that he would be out of town.

On the afternoon of August 18, 2018, the neighbors heard noises coming from Dykstra's condominium next door. Wang went to investigate, found the front door ajar, and heard sounds coming from upstairs. Wang called out, "Who is there?" and two young black men rushed down the stairs toward the door. Wang tried to close the door to stop the men, but one of the men hit him and knocked off his glasses. Wang tried to chase the men. Since he cannot see well without his glasses, Wang could not identify either individual, but said one was wearing a "red hood."

Tsai followed Wang next door and observed the two men running from Dykstra's home toward a red vehicle. The men almost ran into her and she fell to the ground. They sped away in the vehicle and left the development. Another neighbor who heard Wang yelling called 911.

Dykstra returned early from his vacation to find the front door damaged, the home ransacked and several items, mostly jewelry, were missing. Among the missing items was a plain, 14 karat gold band worth approximately $65.

City of Bellevue police officers interviewed neighbors and obtained surveillance video footage from a neighbor and from the homeowners' association. From the video footage, the police were able to identify the license plate number for the red vehicle. The lead detective, Detective Jeff Christiansen, located the vehicle, a Chevy Impala, at an impound lot. The detective obtained a warrant to search the vehicle for fingerprints. That search revealed the fingerprints of an individual named Cornell Burr on a document inside the vehicle. The detective obtained a warrant for Burr's telephone records.

The detective also consulted a website, LeadsOnline, where pawnshops are required by law to record transactions. He determined that a phone number recorded as an incoming call on Burr's telephone two hours before the burglary was also associated with a transaction at Cash America Pawn, a pawnshop in south Seattle, an hour and a half after the burglary. The name on the pawnshop receipt was Jonathan Key.

Video surveillance footage from outside the pawnshop showed that a red Chevy Impala pulled into the parking lot, and two men got out of the vehicle and entered the store. Video from inside the store showed that one of the men was wearing a red t-shirt with a prominent Nike logo. The detective showed a photograph of the pawned ring, a plain gold band, to Dykstra, who believed the ring was his.

The detective obtained a warrant for Key's cell phone records and location data. According to the data, at the approximate time of the burglary, the cell phone was in the southeast corner of the condominium development where Dykstra lived. And at the same time the video footage showed the red Impala and the two individuals at the pawnshop, the cell phone was in the immediate vicinity of Cash America Pawn.

Police officers arrested both Key and Willis about a month after the burglary. At the time of his arrest, Willis told Christiansen that on August 18, he was at his girlfriend's apartment before he drove to Cash America Pawn in the red Impala at around 5:30 p.m. Willis explained that he went to that specific business because a friend from high school worked there. After Willis signed a written statement to

this effect, Christiansen said he believed that Willis was involved in the burglary and asked why he chose Bellevue. Willis responded that he did not know. The detective asked for details about the burglary, and Willis said that he did not assault anyone. When the detective asked what happened to the rest of the jewelry, Willis said he did not know. Police officers obtained a search warrant to search Key's apartment and found a red t-shirt in a laundry hamper that appeared to be the same shirt depicted in the pawnshop surveillance footage.

The State charged Key and Willis with burglary in the first degree and trafficking in stolen property in the first degree. Following a CrR 3.5 hearing, the court ruled that all of Willis's custodial statements were admissible. Several witnesses testified at Key and Willis's joint trial, including Dykstra, neighbors, and police officers. Christiansen testified about Willis's statements without objection. Neither Key nor Willis testified. The jury convicted both defendants of burglary in the first degree, but was unable to reach a verdict on the trafficking count.[1]

For purposes of sentencing, the State represented that Key's standard range was between 87 and 116 months, based on an offender score of 9, and recommended a sentence of 101 months. Defense counsel asked the court to consider imposing a sentence at the "low end of the standard range," because Key was 20 years old at the time of the crime and most of his criminal history was attributable to juvenile convictions. The court imposed a sentence of 90 months. Key timely appealed.

---

[1] The court declared a mistrial as to the trafficking counts and they were later dismissed.

ANALYSIS

I.      Confrontation Clause and Prosecutorial Misconduct

Key argues that the State "improperly and repeatedly" insisted that the jury could use Willis's out-of-court statements as evidence of his guilt, in violation of his right of Sixth Amendment right confrontation.

The Sixth Amendment guarantees an accused the right to confront the witnesses against him. U.S. CONST. amend. VI; Crawford v. Wash., 541 U.S. 36, 42, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We review alleged violations of the Confrontation Clause de novo. State v. Fisher, 185 Wn.2d 836, 841, 374 P.3d 1185 (2016).

In Bruton v. United States, 391 U.S. 123, 126, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the Supreme Court held that a criminal defendant is denied the right of confrontation when a nontestifying codefendant's confession that names the defendant as a participant in the crime is admitted at a joint trial, even where the court instructs the jury to consider the confession only against the codefendant.

Almost two decades later, the Court clarified Bruton in Richardson v. Marsh, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), holding that Bruton does not apply unless the codefendant's statements facially incriminate the defendant. Richardson, 481 U.S. at 208-11. The Court explained that the "calculus changes when confessions that do not name the defendant are at issue." Id. at 211.

> [T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

5

Id. If a nontestifying codefendant's confession becomes incriminating "only when linked with evidence introduced later at trial," there is no "overwhelming probability" that the jury will disregard a limiting instruction. Id. at 208.

In this case, Willis's out-of-court statements did not name Key or refer to him in any way. The statements were not facially incriminating and Key does not argue otherwise.[2] It is undisputed that the court properly instructed the jury that it was prohibited from considering Willis's statement as evidence against Key. Nevertheless, Key argues that the prosecutor's closing argument, urging the jury to consider the evidence as a whole and failing to remind the jury that it could not consider Willis's statements as evidence against him, "nullified" the court's limiting instruction. Acknowledging that he failed to object to any of the prosecutor's remarks, Key contends that the constitutional error is "manifest" and could not have been cured by objection or curative instruction. See RAP 2.5(a) (3) ("[M]anifest error affecting a constitutional right" may be raised for the first time on appeal.)

Although he does not frame his argument as such, Key essentially claims that the prosecutor committed misconduct in his closing. To establish misconduct, Key must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record. State v. Hughes, 118 Wn. App. 713, 727, 77 P.3d 681 (2003). Prejudice exists if there is a substantial likelihood that the misconduct affected the verdict. State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). Where, as here, a defendant does not object or request a curative instruction, the

---

[2] Key initially suggested severing the trials or redaction, and acknowledged during the hearing on pretrial motions that because the statements were redacted, there was no confrontation issue under Bruton.

defendant has waived the error unless the remarks are "'so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury.'" Id. at 52 (quoting State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

Key contends that the facts are analogous to those in Richardson. In that case, codefendants Marsh and Williams were jointly tried for murder, robbery, and assault. Williams's statement was redacted to omit all reference to Marsh or any indication that anyone other than Williams and a third party, Martin, participated in the crime.[3] 481 U.S. at 203. The court instructed the jury not to use Williams's statement in any way against Marsh. Id. at 211. Because Williams's confession was incriminating to Marsh only when linked with evidence later introduced at trial, the Supreme Court reversed the Sixth Circuit's decision that the court violated Marsh's confrontation rights by admitting the statement in the joint trial. Id. at 208. As explained, the Court confirmed that statements that incriminate merely by inference are "outside the narrow exception" of Bruton and do not violate the right to confrontation. Id.

That determination did not, however, completely resolve the case. This was so because, during closing arguments, the prosecutor encouraged the jury to do precisely what the limiting instruction was designed to avoid—to assume, based on the combination of Williams's statement and Marsh's testimony, that Marsh heard the incriminating conversation Williams recounted in his statement and was

---

[3] Martin was charged alongside the others but was a fugitive at the time of trial. Richardson, 481 U.S. at 202.

therefore, guilty. Id. at 205, n.2. The Court described this argument as seeking "to undo the effect of the limiting instruction." Id. at 211. Because Marsh's lawyer did not object to the prosecutor's comments, the Court remanded for a determination of whether they nonetheless could serve as a basis for post-conviction relief. Id.

But here, the prosecutor's closing argument simply encouraged the jury to examine "all the evidence together", rather than in "isolation," or "[pixel] by [pixel]." This argument was consistent with the court's instructions: "In order to decide whether any proposition has been proved, you must consider all of the evidence that I have admitted that relates to the proposition." The argument did not undermine or seek to undo the instruction that prohibited the jury from considering Willis's statement as evidence of Key's guilt. As the Supreme Court observed in Richardson, we do not consider evidence introduced at trial to be evidence "'against'" a codefendant where the jury is instructed not to consider it for that purpose due to "the almost invariable assumption of the law that jurors follow their instructions." Id. at 206. Because of the limiting instruction, Willis's statements were not included in "all [of] the evidence" the jury could consider to determine Key's guilt. And the prosecutor did not suggest that the jury could disregard that instruction by relying on Willis's statements to find Key guilty. The argument here is not analogous to the State's argument in Richardson. And the facts do not remotely resemble those in Brown v. Superintendent Green SCI, 834 F.3d 506, 518 (3d Cir. 2016), where the jury heard a redacted statement but was later told

8

during the State's closing argument that the redactions referred to the codefendant.[4]

The prosecutor remarked at one point that Key and Willis specifically went to the Cash America Pawn because "they" knew someone who worked there who could "perhaps . . . help them out," when that inference could be drawn only from Willis's statement. But the prosecutor's argument later clarified that the evidence established only that Willis had a friend who worked at the shop. Ultimately, how the defendants selected the pawnshop was only marginally relevant in light of the direct evidence showing that they went there together shortly after the burglary and conducted a transaction, including surveillance footage, the receipt, and GPS[5] location data.[6] The prosecutor highlighted connections between other evidence (e.g. surveillance footage and GPS location data) and Willis's statements (e.g. his admission to driving the Impala to the pawn shop about an hour after the burglary). Pointing out these links was not improper because the law recognizes that a non-facially incriminating codefendant's statement may become incriminating when linked to other evidence. Richardson, 481 U.S. at 208-09. Key has not shown that the prosecutor's arguments, even if improper, were so flagrant that an objection and curative instruction could not have cured any prejudice.

---

[4] There was no argument "designed to appeal to a broader social cause," as in State v. Loughbom, No. 97443-8, 2020 WL 4876927, slip op. at *2-3, *5 (Wash. Aug. 20, 2020) ("[P]rosecutor's improper framing of Loughbom's prosecution as representing the war on drugs, and his reinforcing of this theme throughout, caused incurable prejudice.").

[5] Global Positioning System.

[6] The evidence was also primarily relevant to the trafficking charge, and the jury did not reach a verdict on that charge.

II.     Ineffective Assistance of Counsel

Key next claims that he received ineffective assistance of counsel because counsel failed to object to (1) a jury instruction pertaining to "weight and credibility" of out of court statements, (2) Christiansen's identification testimony, and (3) testimony about GPS location data associated with Key's telephone number.

Claims of ineffective assistance of counsel present mixed questions of law and fact that we review de novo. State v. A.N.J., 168 Wn.2d 91, 109, 225 P.3d 956 (2010). To demonstrate ineffective assistance of counsel, a defendant must first establish that defense counsel's representation was deficient in that the performance fell below an objective standard of reasonableness, considering all of the circumstances. State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009). Second, a defendant must show that counsel's representation prejudiced the defendant, which entails showing a reasonable probability that, except for counsel's errors, the result of the proceedings would have been different. State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). It is not enough for the defendant to show that the errors "had some conceivable effect" on the outcome of the proceeding. Strickland v. Wash., 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A reviewing court need not consider both prongs of the ineffective assistance analysis if a defendant fails on one. In re Pers. Restraint Pet. of Crace, 174 Wn.2d 835, 847, 280 P.3d 1102 (2012).

Where the claim is based on the failure to object or challenge the admission of evidence, the defendant must show (1) an absence of legitimate strategic or tactical reasons supporting the failure to object, (2) that an objection likely would

have been sustained, and (3) that the result of the trial would have been different had the evidence not been admitted. McFarland, 127 Wn.2d at 336-37; State v. Hendrickson, 129 Wn.2d 61, 80, 917 P.2d 563 (1996). We strongly presume that defense counsel's conduct was not deficient. State v. Emery, 174 Wn.2d 741, 755, 278 P.3d 653 (2012).

Key contends that counsel performed deficiently by failing to object to Instruction No. 4, a pattern instruction proposed by Willis, which directed jurors to "give such weight and credibility to any alleged out-of-court statements as you see fit, taking into consideration the surrounding circumstances." See Wash. Pattern Jury Instruction (WPIC) 6.41. He claims that this instruction conflicted with Instruction No. 5, the limiting instruction he endorsed, which provided, "You may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant." See WPIC 6.42. According to Key, instruction No 4 was irreconcilable with the limiting instruction and allowed the prosecutor to argue that the jury could use "every piece of evidence offered against both defendants."

Key does not claim that instruction No. 4 was an incorrect statement of law. And although he maintains that the instruction was "unnecessary" for him, he does not dispute that it was nonetheless appropriate for his codefendant. The instruction directing the trier of fact to determine the "weight and credibility" to assign to out-of-court statements did not negate the instruction that prohibited the jury from using Willis's statements as evidence against Key. Because the instructions were not erroneous or in conflict, there was no basis to object.

11

Key's next claim involves Christiansen's trial testimony in which he (1) identified Key as one of the individuals shown in the pawn shop surveillance footage, (2) identified the red Nike t-shirt found in Key's residence as the same shirt shown in that footage, and (3) concluded that Key was at the scene of the burglary because he was wearing the same shirt as the person later depicted in the pawn shop surveillance footage. Key argues that counsel could have lodged a successful objection to this testimony and the failure to have done so constitutes ineffective assistance. See State v. Hardy, 76 Wn. App. 188, 884 P.2d 8 (1994) (Lay witness may state an opinion about the identity of a person depicted in a surveillance photograph if there is some basis to conclude that the witness is more likely to correctly identify the defendant than is the jury.); See also State v. George, 150 Wn. App. 110, 118, 206 P.3d 697 (2009) (Lay witness testimony identifying a person in surveillance footage allowable if the witness has had "sufficient contacts" with the person or the person's appearance at trial differs from the appearance in the photographs.)

Even if we assume that the court would have likely sustained defense objections to the identification testimony, Key's argument fails to appreciate defense counsel's theory of the case—that Key became a suspect because the investigation was guided by nothing more than "[a]ssumptions, presumptions, and conclusions." (Alterations in original.) With regard to identity, counsel encouraged the jury to examine the video and photographic evidence for itself. Counsel also reminded the jury that the witness who interrupted the burglary and was the only person who saw the individuals up close, testified that one of the men was wearing

different clothing—a red hooded sweatshirt.  The jury was able to compare its perception of Key in the courtroom with the person depicted in the images captured from the pawnshop surveillance video and was able to view the surveillance video footage at the scene of the burglary.  And the jury had Key's state identification card photograph for comparison.  In light of counsel's strategy and characterization of the investigation, Key cannot show that the failure to object to the testimony was based on the "'absence of legitimate strategic or tactical reasons.'"  Emery, 174 Wn.2d at 755 (quoting McFarland, 127 Wn.2d at 336).

Key next argues that counsel rendered ineffective assistance by failing to object to hearsay testimony when Christiansen repeated information received from an AT&T employee about the location of a cell phone associated with Key on the date of his arrest.  However, the detective simply described his course of action, without revealing any information provided by a third party.  Christiansen testified that when he sought to locate Key, he obtained a "GPS location warrant" for the cell phone number associated with him.  Pursuant to that warrant, the service carrier sent data consisting of latitude and longitude for the cell phone at regular intervals.  Based on that information, police officers went to a location in the city of Fife, set up surveillance, and eventually located Key.  While the detective's testimony made it clear that police officers relied on information supplied by AT&T, he did not repeat that information.  There was no basis for a hearsay objection.

Key also contends that counsel performed deficiently at sentencing by failing to apprise the court of valid legal grounds to depart from the standard range

based on Key's relative youth at the time of the crime and his criminal history, which included juvenile criminal offenses committed at a very young age.[7]

But, in fact, defense counsel argued that Key's age, both at the time of the crime and when he accrued most of his criminal history, diminished his culpability and warranted a sentence at the bottom of the range. The court imposed a sentence that was three months above the bottom of the standard range. In doing so, the court expressly cited Key's "age and the fact that his—while extensive offender score of 9 does contain many offenses that were committed . . . when he was [a] juvenile" as the basis for imposing a sentence that was five months less than Willis's sentence. (Alterations in original.)

Absent a specific request, the sentencing court had discretion to depart from the standard range. See In re Pers. Restraint Pet. of Light-Roth, 191 Wn.2d 328, 336, 422 P.3d 444 (2018) ("[The Sentencing Reform Act of 1981][8] has always provided the opportunity to raise youth for the purpose of requesting an exceptional sentence downward, and mitigation based on youth is within the trial court's discretion.") And, even assuming a possibility that the court would have imposed a different sentence if Key's counsel had relied on State v. O'Dell, 183 Wn.2d 680, 358 P.3d 359 (2015), to advocate for an exceptional sentence below the standard range, "mere possibilities do not establish a prima facie showing of actual and substantial prejudice." In re Pers. Restraint Pet. of Meippen, 193 Wn.2d. 310, 317,

---

[7] Key's judgment and sentence indicates that eight prior convictions were included in his offender score, and that he was 13 or 14 years old at the time he was sentenced for five of his prior convictions.

[8] Chap. 9.94A RCW.

440 P.3d 978 (2019). Because Key makes no showing of prejudice, his ineffective assistance of counsel claim fails.

III.     Criminal History

Finally, Key argues that he is entitled to a new sentencing hearing because the State provided only a summary of his criminal history and failed to prove his offender score. The State concedes that resentencing is required.

"In calculating the offender score, the State must prove the [defendant's] criminal history by a preponderance of the evidence." State v. Cate, 194 Wn.2d 909, 912-13, 453 P.3d 990 (2019) (alterations in original). Neither a "prosecutor's unsupported summary of criminal history" nor a defendant's failure to "object to the offender score calculation" satisfies the State's burden. Id. at 913. There "must be some affirmative acknowledgment of the facts and information alleged at sentencing in order to relieve the State of its evidentiary obligations." State v. Hunley, 175 Wn.2d 901, 912, 287 P.3d 584 (2012) (emphasis omitted). We accept the State's concession and remand to the trial court for a new sentencing hearing wherein the State must prove Key's criminal history by a preponderance of the evidence.

We affirm Key's conviction, but remand for resentencing.

WE CONCUR: