J-A25019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JEROME COFFEY | : | |
| | : | |
| Appellant | : | No. 1452 EDA 2024 |

Appeal from the PCRA Order Entered April 25, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0441911-1993

BEFORE:   LAZARUS, P.J., BOWES, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY BOWES, J.:                **FILED DECEMBER 24, 2025**

Jerome Coffey appeals from the order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA").  We affirm.

This Court previously summarized the factual background of this matter thusly:

> [This case] follows the December 12, 1992 shooting death of Johnny Moss[,] who died from a gunshot wound to the head after his assailants pulled him from his vehicle under the pretense of acting as police officers.  The evidence at trial established that Moss was seated in his father's vehicle, stopped at the corner of 24th and Thompson Streets [at approximately 11:00 p.m.] in the City of Philadelphia.  As Moss talked to his brother, Walker Lee Moss (Walker), who was standing at the curb, two other vehicles pulled in around his, boxing him in and blocking egress.  Witnesses testified that three males [out of four total] then exited from the car in front and that one of them, identified as [Appellant], yelled "task force," before another male pulled the victim from his own

_____

[*] Retired Senior Judge assigned to the Superior Court.

vehicle and pushed him into another. Although Walker struggled to help his brother, the assailants shot him, the bullet finding its place in his arm. When he ultimately reached his brother, he found him slumped in the car, bleeding from the head, with a bullet hole behind his ear. After the shootings, all four assailants fled.

Following [Appellant]'s apprehension, [he was charged and] this matter proceeded to a jury trial before the Honorable James J. Fitzgerald in June 1994. [Appellant's cousin, Lee Smith, was also tried as a co-defendant.] Over a considerable number of days, [the jury] received the testimony of a member of the Philadelphia Police Mobil[e] Crime Unit who investigated the scene, as well as the supervising homicide detective and the medical examiner who conducted the victim's autopsy. In addition, the Commonwealth called Nemo Kennedy, Frank Singleton, and Latoya Singleton, each of whom reported encounters during which [Appellant] made incriminating statements about Moss's murder that either claimed responsibility or indicated his own complicity. [Clarence Moss, the victim's nephew, also testified that he recognized Appellant as being involved in the incident, having viewed the encounter from inside a nearby residence.] Finally, the Commonwealth called Walker . . ., who positively identified [Appellant] as one of the assailants[, particularly, the one who yelled "task force," and as someone that he had seen within the neighborhood before.]

***Commonwealth v. Coffey***, 81 A.3d 1006 (Table), 2013 Pa.Super. Unpub. LEXIS 889 at 1-3 (Pa.Super. 2013) (unpublished memorandum). Appellant did not testify, although he called his mother, Daisy Coffey ("Daisy"), and his sister, Jean Coffey ("Jean"), to speak to their recollection that Appellant was at home with them on the night of the shooting.

Following trial, Appellant was convicted of second-degree murder, aggravated assault, possession of instruments of a crime, and criminal conspiracy, whereas co-defendant Lee Smith was acquitted of all charges. The trial court imposed on Appellant a sentence of life in prison.

Appellant thereafter filed a direct appeal to this Court. As we later acknowledged, "the procedural history of the case assume[d] a tortured path, so sparsely documented that, seven years after the 1994 conviction, a panel of this Court remanded the case to the trial court with direction to supplement the record in view of the absence of several portions of the transcript." *Id*. at 5. Despite our remand order being docketed in 2001, it took an additional twelve years before this Court ultimately rendered a decision as to the merits of Appellant's direct appeal. As aptly explained and summarized by the PCRA court:

> The record remained incomplete until March 2007, when counsel for [Appellant] filed a statement addressing the state of the record. However, on September 24, 2007, the Superior Court dismissed [Appellant]'s direct appeal due to appointed counsel's failure to file an appellate brief.
>
> On July 9, 2008, [Appellant] filed a petition under the PCRA seeking reinstatement of his right to appeal *nunc pro tunc*. [Appellant]'s direct appeal rights were reinstated . . . and on May 29, 2013, the Superior Court affirmed [Appellant]'s judgment of sentence. On November 20, 2013, the Pennsylvania Supreme Court denied *allocatur*. [Appellant] was represented on reinstated appeal by J. Michael Farrell, Esquire.
>
> On November 21, 2014, [Appellant] filed a *pro se* second petition under the PCRA . . ., which is at issue here. On February 29, 2016, David Rudenstein, Esquire[,] was appointed to represent [Appellant], and on May 26, 2017, [Appellant] filed a counseled, amended petition. On November 1, 2017, Martha Conley, Esquire[,] entered her appearance for [Appellant] pro bono, replacing [Attorney] Rudenstein, and on April 7, 2021, [Appellant] filed another amended petition.
>
> On October 6, 2021, Bret Grote, Esquire, entered his appearance on behalf of [Appellant] pro bono alongside Ms. Conley, and on February 21, 2022, Rupalee Rashatwar, Esquire,

also entered her appearance. On February 21, 2022, [Appellant] filed a third amended petition, which incorporated all arguments from [Appellant]'s April 7, 2021 amended petition and superseded all previous filings. On September 2, 2022, [Appellant] filed a supplement to his amended petition.

[In June] 2023, the Commonwealth filed a response to [Appellant]'s amended petition [as supplemented], in which it stated that it did not oppose an evidentiary hearing on all of [Appellant]'s claims except for (1) ineffective assistance of trial and appellate counsel for failure to raise a **Batson**[1] claim; and (2) ineffective assistance of appellate counsel for failing to raise a claim that the presence of uniformed police officers in the courtroom prejudiced [Appellant. Counsel] filed a reply to the Commonwealth's response [that same month], in which he specifically claimed an evidentiary hearing was necessary to litigate the **Batson** claim. Following a status hearing . . ., the court directed [Appellant] to file a supplemental brief addressing his purported entitlement to relief that was premised upon the missing transcripts in his case. [Thereafter, Appellant] filed the requested supplemental briefing [and the Commonwealth responded].

On September 7, 2023, the court dismissed [Appellant]'s **Batson** claim without an evidentiary hearing. The court then held a three-day evidentiary hearing from September 11th through September 13th on [Appellant]'s remaining claims[, wherein both Appellant and the Commonwealth called multiple witnesses]. Following the evidentiary hearing, [Appellant] filed a post-hearing brief[, as did the Commonwealth.] . . . On April 25, 2024, after having reviewed the briefs from both [Appellant] and the Commonwealth, the court rendered findings of fact and conclusions of law and dismissed [Appellant]'s [petition.]

PCRA Court Opinion, 8/13/24, at 2-4 (cleaned up).

---

[1] **See Batson v. Kentucky**, 476 U.S. 79, 89 (1986) (stating that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant").

This timely appeal followed. Both Appellant and the PCRA court complied with the dictates of Pa.R.A.P. 1925. Appellant presents the following eleven issues for our review, which we have reordered for ease of disposition:

1. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that trial counsel was constitutionally ineffective in failing to offer any individualized argument as to the suppression of prosecution witness [Walker]'s in-court identification of [Appellant] after [Walker]'s lineup identification was properly suppressed due to denial of [Appellant]'s right to counsel at the lineup?

2. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that his rights under **Brady v. Maryland**, 373 U.S. 83 (1963), were violated when the prosecution suppressed a handwritten note from a police officer written the night of the murder reflecting that prosecution witness Walker . . . did not know the perpetrators of the offense, which contradicts [Walker]'s later testimony that he could identify [Appellant] as a perpetrator because he knew [Appellant] prior to the murder?

3. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that trial counsel was constitutionally ineffective by failing to investigate alibi witness [Jean]'s hospital records[,] which corroborated [Appellant]'s alibi defense, and where these hospital records would have prevented the trial prosecutor from effectively impeaching the memory of another alibi witness for [Appellant]?

4. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that his rights under [**Brady**] were violated when the prosecution suppressed hospital records from Jean . . . which were in its possession and which corroborated [Appellant]'s alibi defense and should have prevented the trial prosecutor from impeaching an alibi witness's memory regarding dates reflected in the suppressed hospital records?

5. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that trial counsel was constitutionally ineffective by absenting himself from prosecution

witness Nemo Kennedy's pre-trial material witness bond hearing, where trial counsel would have learned crucial impeachment information, including reference to an undisclosed third party statement implicating Kennedy in the murder, Kennedy's sworn testimony about police threats made against him and his family in order to compel his testimony against [Appellant], and Kennedy's sworn testimony that a statement he gave to police which implicated [Appellant] in the murder was false?

6. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that trial counsel was constitutionally ineffective by failing to impeach prosecution witness Nemo Kennedy with a statement implicating Kennedy in the murder for which [Appellant] was convicted?

7. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that his rights under [*Brady*] were violated when the prosecution suppressed a signed statement given to police by Renaldo Robichaw[,] which implicated prosecution witness Nemo Kennedy in the murder and would have been used by effective trial counsel to wholly discredit Kennedy's testimony against [Appellant], undermine the police and prosecution's entire investigation and prosecution of [Appellant], and introduce the possibility of an alternative suspect in the minds of jurors?

8. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that trial counsel was constitutionally ineffective by failing to investigate potential defense rebuttal witness Andre Edmonds, where Edmonds testified to facts which would have rendered prosecution witness Nemo Kennedy's implication of [Appellant] in the murder wholly incredible and where Edmonds testified that he attempted to reach [Appellant]'s trial counsel but was never contacted by trial counsel?

9. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that appellate counsel was constitutionally ineffective in abandoning a claim on appeal that [Appellant]'s Confrontation Clause rights were violated at trial where prosecution witness Latoya Singleton testified about a co-defendant's purported statement implicating [Appellant] in the offense and where the trial prosecutor "unmasked" [Appellant] as

the subject of his co-defendant's statement during closing argument?

10. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that appellate counsel was constitutionally ineffective in failing to raise a claim on appeal under *Commonwealth v. Shields*, 383 A.2d 844 (Pa. 1978), that [Appellant] had a colorable claim that his Confrontation Clause rights were violated, but could not be reviewed due to loss of significant and necessary portions of his trial transcripts and lack of any equivalent picture of the relevant portions of the proceedings?

11. Did the PCRA court err in dismissing [Appellant]'s PCRA petition where [Appellant] pled and proved that the cumulative effects of violations of his right to constitutionally effective counsel and under [*Brady*] entitle him to relief?

Appellant's brief at 2-6 (some capitalization and citations altered.

All of Appellant's claims on appeal fall within two broad categories: (1) a challenge to the efficacy of trial or appellate counsel, and (2) purported violations of Appellant's constitutional rights by the Commonwealth pursuant to *Brady*. Before examining each issue *seriatim*, we generally recount the relevant legal principles.

This Court reviews the dismissal of a PCRA petition to determine "whether the findings of the PCRA court are supported by the record and are free from legal error." *Commonwealth v. Howard*, 285 A.3d 652, 657 (Pa.Super. 2022) (cleaned up). Ultimately, "[i]t is an appellant's burden to persuade us that the PCRA court erred and that relief is due." *Commonwealth v. Stansbury*, 219 A.3d 157, 161 (Pa.Super. 2019) (cleaned up).

- 7 -

With respect to Appellant's attacks on the adequacy of counsel's representation, we observe that "counsel is presumed to be effective, and a petitioner must overcome that presumption to prove" his entitlement to relief. *See Commonwealth v. Simpson*, 112 A.3d 1194, 1197 (Pa. 2015). In that regard:

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043 (Pa.Super. 2019) (cleaned up). The petitioner's failure to sustain any prong of the test defeats the claim. *See*, *e.g.*, *Commonwealth v. Rivera*, 199 A.3d 365, 374 (Pa. 2018). The Supreme Court of the United States has noted that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial." *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *see also Commonwealth v. Wright*, 961 A.2d 119, 135 ("A defendant is entitled to a fair trial but not a perfect one." (citation omitted)).

Furthermore, our High Court has offered the following summary of the law governing Appellant's **Brady** claims:

> In **Brady**, the United States Supreme Court held that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The Supreme Court subsequently held that the duty to disclose such evidence is applicable even if there has been no request by the accused, and that the duty may encompass impeachment evidence as well as directly exculpatory evidence. Furthermore, the prosecution's **Brady** obligation extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution.
>
> On the question of materiality, the Court has noted that such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. The materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions. Rather, the question is whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. Thus, there are three necessary components that demonstrate a violation of the **Brady** strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued.

**Commonwealth v. Lambert**, 884 A.2d 848, 853-54 (Pa. 2005) (cleaned up).

With this background in mind, we turn to Appellant's issues on appeal.

A. <u>Walker's in-court identification</u>

In his first claim, Appellant asserts ineffective assistance of trial counsel, Michael G. Floyd, Esquire, for failing to more vigorously challenge Walker's in-

court identification of Appellant as Johnny Moss's shooter. **See** Appellant's brief at 39-46.

By way of background, four months after the shooting, Walker participated in a lineup during which he identified Appellant as being involved in the incident, recognizing him by the name of "Hoagie." However, the trial court later granted a motion to suppress the lineup because it was performed without any defense counsel present. At trial, Appellant's counsel similarly sought to preclude Walker from identifying Appellant as the shooter in court, but in so doing merely relied upon arguments advanced by the counsel of co-defendant, Lee Smith. Smith, unlike Appellant, was not identified by Walker as a perpetrator at the lineup. The trial court rejected the co-defendants' requests and permitted Walker to identify both Appellant and Smith in court, finding that Walker had bases independent of the faulty lineup to support his testimony. These included, among other things, the strong lighting conditions and the fact that Walker had previously seen Appellant within the neighborhood and was familiar with his nickname.

Appellant asserts that counsel's representation in this regard was constitutionally inadequate, as there were stronger arguments his attorney could have raised to persuade the trial court to preclude identification. Citing precedent from the Supreme Court of the United States, he notes that:

> [w]hen a witness's identification of a defendant at a pretrial lineup is inadmissible because the defendant was deprived the right to counsel, a subsequent in-court identification by that witness is not admissible unless the trial court determines that the in-court

identification is not tainted by the illegal lineup and is derived from an independent origin.

*Id*. at 40 (citing ***Gilbert v. California***, 388 U.S. 263 (1967)).  He contends that because the out-of-court lineup identification was suppressed as illegal, the burden then shifted to the Commonwealth to demonstrate that Walker had an independent ground for identification.  *Id*. at 41.  Appellant highlights that there were difficulties and inconsistencies with Walker's identification, namely that he initially told police that the person who yelled "task force" during the incident was "stocky" and approximately 5'5" or 5'6" in height, whereas Appellant is 6'2" and 180 pounds.  *Id*. at 41-42.  Appellant emphasizes that this is not a "trivial discrepancy," but rather describes an entirely different person.  *See* Appellant's reply brief at 12.  He also notes that Walker did not identify Appellant by his street name of "Hoagie" until the unconstitutional lineup, months after the shooting, and that he was shown additional photographs beforehand that potentially introduced additional "taint."  Appellant's brief at 42.

While Appellant acknowledges that trial counsel moved to preclude the identification in court, he contends that counsel did not convincingly argue these pertinent facts at that time.  *Id*. at 42-44.  Instead, counsel relied solely upon the points raised by Smith's attorney, which were inapt because Walker did not identify Smith at the line-up.  *Id*. at 43.  Appellant argues that "[w]hen in-court identifications are erroneously allowed despite illegal out-of-court identifications with insufficient proof of independent origin, prejudice can be shown even in the face of additional evidence."  *Id*. at 44.  In addressing this

additional evidence, Appellant maintains that although eyewitness and nephew to the victim, Clarence Moss, also identified Appellant in court as a perpetrator, that testimony was suspect for a variety of reasons, including the witness's youth, history of juvenile adjudications giving him reason to lie to curry favor with law enforcement, and inconsistent accounts to police. *Id*. Appellant additionally faults the PCRA court for placing the burden on him, rather than the Commonwealth, to prove any infirmity as to the out-of-court lineup. *Id*. at 45. He concludes that "[a] reasonable trial attorney in [Attorney] Floyd's situation would have ensured that Walker . . . was never permitted to identify [Appellant] at trial." *Id*.

The PCRA court found that Appellant did not meet his burden with respect to this claim, particularly because he did not prove sufficient prejudice. It recounted that the trial judge in 1994 "ruled that there was an independent source for Walker's in-court identification" of Appellant, namely that he was able to see the assailants' faces during the eleven-minute encounter and that lighting conditions were good, despite it occurring at night. *See* PCRA Court Opinion, 8/13/24, at 14-15. The PCRA court also noted a previous finding from the trial judge that "at no time during any identification procedure did the police indicate that the [various] defendants were involved, and that no identification procedure was impermissibly suggestive based on improper police conduct." *Id*. at 15 (citing N.T., 5/24/94, at 19-20 (cleaned up)). The PCRA court thus concluded that since there was no evidence of a procedural infirmity with the pre-trial lineup beyond the absence of Appellant's counsel,

Appellant was not prejudiced by trial counsel's failure to make additional argument to preclude the subsequent in-court identification. *Id*. It further determined that both the discrepancy in Walker's initial description of Appellant's physical characteristics to police and any exposure to a photo array would not have altered the trial court's findings, since "the totality of the circumstances established that Walker's identification of [Appellant] was reliable[.]" *Id*. at 16.

Beyond reiterating some of the same matters highlighted by the PCRA court, in its brief, the Commonwealth maintains that Appellant's burden-shifting argument misses the point, since he misconstrues the burden relating to a defendant's motion to preclude in-court identification versus that imposed on a petitioner at a PCRA hearing. *See* Commonwealth's brief at 65-66 (citing *Commonwealth v. Spotz*, 84 A.3d 294 (Pa. 2014), for the proposition that "when a PCRA petitioner asserts his trial counsel was ineffective for failing to litigate a pre-trial suppression claim, the burden of proof is on the defendant, not the Commonwealth.") The Commonwealth notes that the trial judge in this case reviewed extensive evidence and testimony concerning how the lineup was performed, and while it was illegal for lack of counsel, there was nothing to evince that it was otherwise unduly suggestive. *Id*. at 66. Indeed, this finding is bolstered by the fact that, *inter alia*, Walker misidentified somebody else as co-defendant Smith at the lineup, which mitigates against the notion that it was an overly-biased procedure. *Id*.

Upon review, we cannot conclude that the PCRA court's determinations are either in error or lacking support from the record. Based on the evidence presented, Appellant did not show a reasonable probability that the challenge to Walker's in-court identification would have succeeded had counsel raised the same arguments set forth now. To begin, while we recognize that Walker gave a different physical description of Appellant to police immediately following the shooting than that provided at trial, this would go to the weight of the evidence by which Walker could be impeached, not the admissibility of the identification itself. *See*, *e.g.*, *Commonwealth v. Orr*, 38 A.3d 868, 874 (Pa.Super. 2011) (stating that "any indefiniteness and uncertainty in the identification testimony goes to its weight").

Further, we have not been persuaded that the PCRA court improperly placed an undue burden on Appellant in proving his claim. Although Appellant is correct that during the suppression hearing in 1994, the Commonwealth was required to demonstrate that Walker's in-court identification was not tainted by the prior suppressed lineup, he only cursorily presumes that the burden was not met at that time. As the PCRA court and Commonwealth note, the trial court reviewed substantial evidence before finding that Walker had an independent basis for the in-court identification as of trial. This included Walker's prior knowledge of whom Appellant was, perception of the events on the night in question, the adequate environmental lighting, and the dearth of evidence showing that the lineup unfairly pointed to the co-defendants. The trial court concluded that the Commonwealth met its burden at that juncture,

and now for purposes of the PCRA evidentiary hearing, it was Appellant who needed to demonstrate prejudice. **See Stansbury**, 219 A.3d at 161. In all, we do not find that these newly-developed arguments would have convinced the trial court to disallow Walker from identifying in court the man he claimed was involved in killing his brother. Hence, no relief is due for this claim of ineffectiveness of counsel.

B.  Police note concerning Walker's ability to identify the assailants

Closely related to the previous issue, Appellant contends that the Commonwealth violated **Brady** by failing to disclose before trial a handwritten note that appears to have been created by an officer on scene during the night of the murder. **See** Appellant's brief at 75-81. The note, which is not signed, recorded Walker's impression of the shooters immediately after the incident, and indicated in relevant part:  "Don't know them, can ID."  N.T. Hearing, 9/11/23, at Defense Exhibit 2. As discussed above, Walker later identified Appellant at a lineup and again at trial. During trial, he testified that he had never interacted with Appellant, but that he had seen him around the neighborhood before the shooting and that everyone knew him by the name of "Hoagie."

Appellant argues that this note constituted a "facial contradiction" to Walker's testimony and could have been used for effective impeachment purposes. **See** Appellant's brief at 75-76. He additionally posits that the note "thoroughly undermines the notion that Walker . . . had an independent basis"

for identifying Appellant in a lineup four months after the killing. *Id*. at 76.

Appellant avers that evidence of a witness previously failing to identify a defendant, like this note, is subject to disclosure by the Commonwealth pursuant to *Brady*. *Id*. at 77. He believes that had this information been utilized by counsel, the trial court would not have permitted Walker's in-court identification. *Id*. at 79-80.

In rejecting this claim, the PCRA court found as follows:

> Contrary to [Appellant]'s argument, Walker's statement to the officer as memorialized in the officer's note did not contradict Walker's testimony in any significant way. At both the suppression hearing and at trial, Walker claimed only that he had seen [Appellant] before, and knew that people called him "Hoagie." That is substantially consistent with a statement to an officer that he did not "know" any of the perpetrators, but was able to identify them. Because the impeachment value of the note was minimal, there is not a reasonable probability that the result of the trial could have been different if the note had been disclosed. Therefore, the Commonwealth's failure to produce it did not violate *Brady*, and no relief is due.

PCRA Court Opinion, 8/13/24, at 27-28.

The Commonwealth provides additional explanation as to why it believes the note had little impeachment benefit:

> Walker's trial testimony was generally that [Appellant] was a tenuous acquaintance from the neighborhood. In other words, Walker knew who [Appellant] was from seeing him once before in the neighborhood, but had never spoken to [Appellant] and did not "know" him personally. He testified at the suppression hearing, "I had seen [Appellant], you know, once before, before that night of the crime." N.T. 5/16/92 at 17; *see also id*. at 26 ("I just knew one of them name. . . . That's Hoagie. I didn't know what his first name is . . . .) and *id*. ("Q. Can you tell what is the basis you refer to them by names, how did you get to know their names? A. Well, Hoagie name is in the street; everyone know

- 16 -

him, know him as Hoagie."). Then, at trial, when asked if he had "seen any of the [perpetrators] before in your life," Walker responded: "Well, yes, one I had seen. . . . I had saw him, you know. . . . That would be Mr. Hoagie." N.T., 6/7/9[4], at 194. And Walker's testimony about a different man . . . further suggested that he did not consider seeing someone once and having heard their name around the neighborhood to be the same thing as "knowing" them. N.T., 6/8/94, at 50–51 ("Do I know him, no. . . . I heard his name. . . . I saw him once . . . .").

Moreover, Walker's alleged statement to officers was consistent with the formal police statement he gave later that night, which was read to jurors. In that statement, Walker was asked, "Would you be able to I.D. anyone from tonight?" He answered, "Probably the guy who did the shooting. The one that said task force." N.T., 6/8/94, at 38–39. As he admitted under cross-examination, he did not at that time tell officers that he recognized the man as "Hoagie." He simply said that he could probably identify him in the future. *Id*. at 83–84.

Accordingly, jurors already knew that on the night of the crime, Walker did not tell police that he knew (or knew of) the perpetrator. The hand-written note simply repeats what the jurors already knew about what Walker told the police that night—he didn't know the man who said "task force," but could probably make an identification in the future.

Commonwealth's brief at 68-69 (cleaned up). The Commonwealth further argues that it is unclear how the note would have been introduced at trial by Appellant had it been disclosed, and that in the same vein, it would not have influenced the trial court's pre-trial decision to permit Walker's in-court identification. *Id*. at 70-71.

We find no fault with the PCRA court's decision to deny relief as to this claim. Assuming, *arguendo*, that the handwritten note constituted **Brady** material, the PCRA court's determination of no materiality is supported by the record. Appellant's argument relies heavily upon the semantics of the word

"know." Although he is adamant that introduction of this note would have fundamentally undercut Walker's testimony, the evidence bears out that this was not the case. The statement in the note would merely have impeached Walker in a duplicative manner on a point he was already questioned about, namely his formal statement to police the night of the shooting wherein he did not provide the name "Hoagie" and was somewhat equivocal about the ability to identify the perpetrators. Since introduction of this document at trial would not have raised "a reasonable probability that . . . the result of the proceeding would have been different," the note was not material as required by *Brady* and its progeny. *See Lambert*, 884 A.2d at 854.

Our conclusion is not altered by the High Court's recent decision in *Glossip v. Oklahoma*, 604 U.S. 226 (2025), which was decided while this appeal was pending and was raised in the Commonwealth's brief and Appellant's reply. There, the Court held that "[e]vidence can be material even if it goes only to the credibility of the witness[.]" *Id*. at 248 (cleaned up). The *Glossip* Court vacated a murder conviction because the prosecution failed to correct false testimony given by one of its key witnesses, Justin Sneed. Sneed, who killed the victim, made an agreement to cooperate with the prosecution and testified that he was hired by Glossip to commit the murder.

The false testimony in question given during the trial was "that [Sneed] had been given lithium after asking for Sudafed [in jail] and had 'never seen no psychiatrist or anything.'" *Id*. at 247. The Court held that this information was material because, had it been provided to the defense, it not only could

have been used to impeach Sneed based on a willingness to lie under oath, but also to support the theory that Sneed was solely responsible for the killing. *Id*. at 249-50. It was known that Sneed was a drug user and later determined that he was specifically prescribed lithium to treat bipolar disorder by the prison psychiatrist. It was further undisputed that Sneed's combined diagnosis and drug usage had a high probability of driving him to bouts of violence.

We find **Glossip** distinguishable such that it does not control the outcome of this matter. Here, even if the handwritten police note arguably impeached Walker's account, its potential impact is significantly less than the withheld evidence at issue in **Glossip**, which both indicated the witness's willingness to lie on the stand and provided a motive for the killing. As discussed, the note in the matter *sub judice* was largely consistent with the evidence heard by the jury, and neither undermined Walker's veracity nor implicated someone else as the guilty party. **See**, **e.g.**, N.T. Trial, 6/15/94, at 47-48 (defense counsel conceding during closing argument his belief that Walker is not "a malicious person" who would lie, but rather was mistaken in his identification of Appellant). Further, the note was not groundbreaking because the defense had the opportunity to question Walker based upon not naming "Hoagie" as a perpetrator until months after the shooting. This **Brady** claim thus warrants no relief.

C. Claims relating to Appellant's alibi defense

In his next two issues, Appellant contends that trial counsel was ineffective for failing to procure hospital records relating to the discharge of his sister, Jean, from the hospital the day of the shooting. **See** Appellant's brief at 46-49. In a similar fashion, he argues that the Commonwealth violated **Brady** by not disclosing these same records to Appellant before trial, when it is undisputed that the Commonwealth possessed them. **Id**. at 86-89.

Pertinently, we recount that Appellant raised an alibi defense at trial.[2] More specifically,

> Jean testified that she gave birth to her son on December 10, 1992, and that she came home from the hospital two days later on December 12, 1992, which was the date of the murder. Jean stated that [Appellant] was at her house on the night of December 12, 1992, and that she saw [Appellant] sleeping in her bed at 11 p.m. Daisy[, Appellant's mother,] testified at [Appellant]'s trial that "she thought" Jean came home from the hospital on "December, January the 12th" and that Jean "came out on a Friday or Saturday." On cross-examination, Daisy admitted that she had not told [Appellant]'s counsel until after May 16, 1994, about this information regarding [Appellant]'s alibi. At [Appellant]'s evidentiary [PCRA] hearing, [Attorney] Floyd testified on this issue, stating that he had no recollection of trying to obtain hospital records for Jean.

PCRA Court Opinion, 8/13/24, at 16-17 (cleaned up).

In this context, Appellant argues that trial counsel undertook no investigation "to present corroborating evidence in the form of hospital records confirming the date of [Jean's] release," which allowed the testimony of Jean

_____

[2] In our prior decision, this Court erroneously indicated that Appellant proffered no evidence in his defense. **See Coffey**, 81 A.3d 1006 (Table), 2013 Pa.Super. Unpub. LEXIS 889 at 3.

and Daisy to be prejudicially impeached. *See* Appellant's brief at 48. He avers that had his attorney pursued these documents, they could have been used to invariably bolster the credibility of the witnesses and resolve Daisy's hazy recollection of the date that Jean was discharged. *Id*. at 48-49. With respect to the *Brady* violation, Appellant generally reiterates these same points, along with the fact that the Commonwealth did not disclose the documents in question, despite having them in hand prior to trial. *Id*. at 86-89.

In dismissing the PCRA petition, the court determined that there was a lack of proven prejudice as to the ineffectiveness allegation. It found:

> [T]here is not a reasonable probability of a different outcome had [Attorney] Floyd investigated Jean's hospital records and presented them at trial. As stated by the court in its findings of fact and conclusions of law, although Daisy was equivocal in her recollection of the date Jean came home from the hospital, Jean, the mother of the baby who had just been born, was not uncertain of the date, and Jean's testimony that she came home from the hospital on December 12 was not effectively challenged by the Commonwealth. Moreover, the sole value of the hospital records would have been to corroborate the testimony of [Appellant]'s mother and sister that they were home on the date of the murder. The records did not prove that [Appellant] was at home with them at the time of the murder.

PCRA Court Opinion, 8/13/24, at 17 (cleaned up). The court likewise concluded that based on their limited probative value, the hospital records were not "material" as contemplated by *Brady*, in the sense that they would not have led to a different result at trial if introduced. *Id*. at 28.

The Commonwealth argues furthermore that had these records been entered into evidence, they would have undermined, not aided, Appellant's trial defense. *See* Commonwealth's brief at 81-82. It maintains that Jean testified at trial that she saw Appellant at her house early in the morning on the day of the shooting, whereas the records reflected that she was not discharged from the hospital until nearly noon that day.[3] The Commonwealth also aligns with the PCRA court in asserting that even if the records would have buttressed the credibility of Daisy, they were immaterial in the sense that they did not speak to where Appellant was located during the time of the murder. *Id*. at 82.

We find that Appellant is not entitled to relief on either of these related *Brady* and ineffective assistance of counsel claims. Even though he is correct that the documents likely would have bolstered Daisy's credibility generally by refreshing her recollection as to specific dates in question, they ultimately had a tenuous bearing, at best, on the actual alibi. The shooting occurred in the late evening hours of December 12, 1992, approximately eleven hours after Jean was discharged from the hospital. As the PCRA court noted, the Commonwealth did not dispute Jean's testimony that she was discharged from the hospital earlier on the day of the shooting. If counsel had introduced these

---

[3] Appellant responds that the Commonwealth, through this contention, "ignores the substance of" the alibi witnesses' testimony. He also reasserts that the hospital records were material for *Brady* purposes because they lent general credence to these witnesses, and that they need not have constituted direct proof of innocence. *See* Appellant's reply brief at 24-27.

documents at trial, we do not believe that there is "a reasonable probability that the outcome of the proceedings would have been different." **Sandusky**, 203 A.3d at 1043.

Moreover, although the documents may have aided slightly in fortifying Daisy's credibility in a broad sense, we note that the Commonwealth attacked her testimony at trial not based upon her lack of recollection of the pertinent dates, but rather her decision to wait nearly one and one-half years before informing anyone that Appellant was with her the night of the murder. **See**, **e.g.**, N.T. Trial, 6/15/94, at 87 (arguing at closing that she "[d]idn't tell the lawyer, didn't tell the investigator, didn't tell [Jean], never went up to the prison and told [Hoagie]. Kept it here until she got to city hall on or after May 16, 1994. Why would she testify that way?"). Since introduction of the records would not have overcome this problematic aspect of the defense, it was unlikely to have any effect on the verdict and likewise was not material pursuant to **Brady**.

D. <u>Issues relating to Nemo Kennedy and Renaldo Robichaw</u>

Appellant's next three claims all center around Nemo Kennedy and Renaldo Robichaw, both of whom were acquainted with Appellant at the time of the crime. Specifically, Appellant asserts that trial counsel was ineffective in choosing not to impeach Kennedy with a statement given to police by Robichaw (the "Robichaw Statement"), as well as opting not to stay at a bond hearing for Kennedy as a material witness. **See** Appellant's brief at 27-39.

Appellant further avers that the Commonwealth violated **Brady** when it did not provide the Robichaw Statement to the defense prior to trial. **Id**. at 81-86.

The following background informs our consideration of these interrelated issues. In March 1993, prior to trial, Kennedy provided a statement to police indicating that within hours of the shooting, Appellant came to his residence at 2538 West Turner Street in Philadelphia and said that "we just killed somebody." N.T. Hearing, 9/11/23, at Defense Exhibit 10. Kennedy's statement also expressed that on the following morning, Appellant called him and relayed that "we did Johnny." **Id**. Approximately a month before trial in 1994, however, Kennedy spoke with a defense investigator after receiving a call from Appellant in jail and recanted, proclaiming that he was under the influence of several drugs at the time he gave the statement to police and that it was not accurate.

Roughly eight days after Kennedy's recantation, Robichaw, a friend of Kennedy, furnished the Robichaw Statement to police. At the time, Robichaw was incarcerated for unrelated charges. In the statement, he asserted his understanding that Kennedy, not Appellant, was responsible for the murder. The Robichaw Statement also recounted that Kennedy requested that Robichaw help lay the blame on "Hoagie," i.e. Appellant, but Robichaw informed him that he did not want to be involved. **See** N.T. Hearing, 9/11/23, at Defense Exhibit 1. For reasons unknown, the Robichaw Statement was never provided to counsel for Appellant before or during trial.

On the day after the Robichaw Statement was taken, the court held a hearing to set bond for Kennedy as a material witness for Appellant's trial, as Kennedy had been evading police efforts to contact him in the weeks prior. Appellant himself did not appear for the hearing, though his trial counsel was present up to the time it was set to begin. Counsel then received leave of court to handle an unrelated matter in another courtroom, and informed the court that the attorney for Appellant's co-defendant, Lee Smith, would monitor Appellant's interests. During the bond hearing, the Commonwealth referenced the Robichaw Statement but did not call Robichaw as a witness. Kennedy attested somewhat in line with his recantation, but added allegations "that he did not see [Appellant] on the night after the murder, that police had threatened him and his family to get him to cooperate against [Appellant], and that he recanted his [initial police] statement to [Appellant]'s investigator in May 1994" because he was under the influence of drugs. *See* PCRA Court Opinion, 8/13/24, at 11-12 (citing N.T. PCRA Hearing, 9/13/23, at 42). To counter these allegations, the Commonwealth called Detective Robert Snell, who testified that when he had spoken to Kennedy on the day prior, Kennedy was very hostile and threatened the detective's family. *See* N.T., 5/24/94, at 68.

At trial approximately two weeks later, the Commonwealth called Kennedy as a witness but not Robichaw. Kennedy testified partially in line with his initial 1993 statement to police and not with his recantation or account from the material witness bond hearing. Specifically, he attested that

Appellant came to the residence after the shooting and said that he and some others "just did something." N.T. Trial, 6/7/94, at 94. Kennedy also stated that he confronted Appellant about shooting Johnny Moss two days later, and Appellant replied he did not "care what people said" and "that's how the game goes." *Id*. at 95. After then explaining that he did not recall anything else, the Commonwealth entered into evidence Kennedy's original police statement as a prior inconsistent statement, which provided more detail and wherein Kennedy confirmed to detectives that he was not under the influence of drugs or alcohol. Appellant's trial attorney impeached Kennedy with his recantation, but did not do so with the Robichaw Statement or any information that was disclosed by Kennedy during the material witness bond hearing. Although Kennedy never testified that he recanted in fear of Appellant after Appellant called him from jail, he nonetheless said that he was "shocked" when he learned that Appellant viewed a copy of his 1993 statement to police.

At the evidentiary hearing for Appellant's PCRA petition, both Kennedy and Robichaw testified. Kennedy, contrary to the testimony he provided at trial, maintained that his initial account to police was false. He again iterated that he was intoxicated by drugs on the occasion, detectives threatened him and his family to make him point the finger at Appellant, and he was afraid of prosecution if he did not comply. The Commonwealth called rebuttal witness Detective Steve Vivarina, who relayed that he was involved in the taking of Kennedy's 1993 statement and would not have recorded it if he believed Kennedy was under the influence. Detective Vivarina also denied ever

threatening Kennedy or witnessing any other law enforcement officer doing the same.

Robichaw testified at the PCRA hearing that the Robichaw Statement was untrue, and that he only implicated Kennedy for being responsible for the murder because: (1) police told him that he would be able to go home after giving the statement; and (2) he was under the impression that Kennedy told investigators that Robichaw was involved. In essence, he contended that he gave the false statement solely in retaliation against Kennedy, whom he believed was blaming him for the shooting.

With this context, we return to Appellant's overlapping claims of ineffective assistance of counsel and Commonwealth violations of **Brady**. He avers that trial counsel was ineffective by not attending Kennedy's material witness bond hearing. Had he done so, he would have learned that Kennedy alleged police misconduct in the investigation, which was more egregious than the limited information within his recantation statement to defense investigators. **See** Appellant's brief at 34-35. Appellant also asserts that this testimony would have had a different "character and import" than the recantation since it was given under oath in court. **Id**. at 37. He laments that none of this information made it to the jurors. **Id**. at 35.

Second, Appellant contends that had counsel remained at the bond hearing, he would have discovered the Robichaw Statement, which would have implicated Kennedy, not Appellant, as a perpetrator of the murder. **Id**. at 34. He argues that this was important because "Kennedy was the primary

prosecution witness whose testimony implicated" Appellant, and that Kennedy's "credibility was paramount, and undermining his testimony would have been an essential tactic for any reasonable trial counsel." *Id*. at 28. Appellant summarizes the importance of this information as follows:

> The jury did not hear that Nemo Kennedy considered himself a suspect in the murder and was afraid he would be prosecuted himself if he did not testify against [Appellant]. The jury did not hear that the Robichaw Statement named Kennedy as the perpetrator of the homicide and stated his intent to frame [Appellant]. Effective use of the Robichaw Statement would have provided the jury with an alternative view of the reason for Kennedy's testimony: that . . . Kennedy implicated [Appellant] in the offense to save himself from the threat of prosecution. The Robichaw Statement was explosive impeachment evidence with which Kennedy was never confronted.
>
> The Robichaw Statement is a damning piece of evidence demonstrating the bias and unreliability of Kennedy as a witness due to his motivation to testify falsely to avoid prosecution, as well as the fact that police were willing to procure and use a statement they believed to be false in order to influence the testimony of a trial witness.

*Id*. at 29.

Appellant maintains that there is "more than a reasonable probability that [the statement's] use would have altered the outcome at trial," since it would have impeached Kennedy and cast doubt of the conduct of the officers who took the original statement in 1993. *Id*. at 31. Finally, he argues that prejudice is presumed because co-defendant Lee Smith was acquitted, with the primary difference in evidence against him stemming from Kennedy's testimony. *Id*. at 31-32. Appellant reiterates many of these same points in

his related position that the Commonwealth violated **Brady** by failing to provide to the defense the Robichaw Statement. **Id**. at 81-86.

As with the previous claims discussed *supra*, the PCRA court determined that Appellant failed to meet his burden of proving prejudice or materiality at the evidentiary hearing. It determined that the Robichaw Statement was false and therefore had minimal impeachment value as to Kennedy. **See** PCRA Court Opinion, 8/13/24, at 10, 13. The court further held:

> Kennedy's vague and inconsistent trial testimony required the Commonwealth to substantially rely at trial on . . . Kennedy's March 1993 prior inconsistent statement to police. Since the Robichaw Statement was given in May 1994, more than a year after . . . Kennedy's . . . statement to police, the 1994 Robichaw Statement could not have served as a motive for . . . Kennedy to lie in 1993. Thus, the . . . Robichaw Statement would have been useless in impeaching the gravamen of . . . Kennedy's testimony, which was information elicited from this 1993 statement.

**Id**. at 10-11.

Next, the court found that Kennedy's testimony from the bond hearing was "duplicative" of the recantation he gave to Appellant's investigator, which accordingly put the defense on notice of that information. **Id**. It also determined that Kennedy's statements at the evidentiary hearing about threats from law enforcement investigators were incredible, and thus Attorney Floyd's failure to present such information at trial would not have likely changed the outcome of trial. **Id**. In the same vein, the court held that Appellant's **Brady** claim as to the Robichaw Statement failed for lack of materiality. **Id**. at 26.

For its part, the Commonwealth likewise asserts that there was no prejudice proven with regard to counsel's failure to attend Kennedy's material witness bond hearing or to impeach him with the Robichaw Statement or other information unveiled during the hearing. It highlights that: (1) by Appellant's own concession, the Robichaw Statement was false; (2) Robichaw would have testified to this if called at trial; and (3) Robichaw admittedly had no firsthand knowledge as to who committed the crime. *See* Commonwealth's brief at 44. The Commonwealth notes moreover that while Kennedy's testimony was favorable to the prosecution, "it was also internally inconsistent and asserted that certain portions of his original statement to police, such as the exact words [Appellant] used to confess and where in the house he did so, were untrue." *Id*. at 45. It argues therefore that, had counsel attempted to impeach Kennedy with the Robichaw Statement, the Commonwealth simply could have called Robichaw to demonstrate that the statement was false on its face. *Id*. at 45-46.

The Commonwealth additionally asserts that use of the Robichaw Statement would not have bolstered Kennedy's recantation of his 1993 police statement, which was not so much a recantation, but rather an attempt to distance himself from his statements. In so doing, it opines that the defense investigator at trial confirmed that Appellant did not dispute the accuracy of Kennedy's statement to police. *Id*. at 47-48. The Commonwealth adopts this same reasoning in asserting that the PCRA correctly dismissed Appellant's *Brady* claim involving the Robichaw Statement. *Id*. at 49-50

Based on our review of the record, we cannot discern any error on the part of the PCRA court. We begin by noting that it is apparent that Attorney Floyd did not attend Nemo Kennedy's material witness bond hearing, proffered no reasonable reason for failing to do so, and did not suggest that he made any arrangement to follow up with counsel for Lee Smith after the hearing. It is also plain that the Commonwealth was in possession of the Robichaw Statement prior to trial and did not disclose it to Appellant before initiation of these PCRA proceedings.

However, the court acted within its discretion in finding that, had counsel utilized the Robichaw Statement or other information gleaned from the bond hearing at trial, it would not have raised a reasonable probability of changing the trial's outcome. The Robichaw Statement, which implicated Kennedy as the shooter, was demonstrably false. We agree with the Commonwealth that any attempt to impeach Kennedy with it would have been futile as the Commonwealth could have called Robichaw himself to dispel the statement conclusively, which he acknowledged at the PCRA hearing that he would have done.

Further, Kennedy's credibility at trial was already largely suspect, despite his being a witness of significance. Additional impeachment, even if achieved, would not undermine this Court's confidence in the proceedings. As recounted above, his testimony at trial was vague and far less damning than the information he provided to police in 1993. To support the Commonwealth's theory of the case, it largely utilized Kennedy as a vessel to

introduce his police statement which, much more than his trial testimony, provided evidence of Appellant's guilt. Appellant had the full and fair opportunity to impeach Kennedy about that statement with the information provided to the investigator during his recantation, which bore out more an attempt to disassociate himself than outright recant.

Furthermore, even if the Robichaw Statement would have buttressed Kennedy's recantation, this would not have provided a strong defense for Appellant based on the presumed untrustworthiness of recantation testimony. *See*, *e.g.*, *Commonwealth v. D'Amato*, 856 A.2d 806, 825 (Pa. 2004) (recognizing that, "as a general matter, recantation evidence is notoriously unreliable, particularly where the witness claims to have committed perjury." (cleaned up)). This is especially true in light of the suggestion at trial that Kennedy recanted after being "shocked" from a phone call from Appellant at the jail, who read the 1993 police statement.[4]

Next, despite Appellant's suggestion, we do not presume prejudice merely because co-defendant Smith was acquitted of all charges, whereas Appellant was convicted of second-degree murder. There was additional evidence of Appellant's guilt, beyond Kennedy's testimony, that was unique to Appellant's role in the crime. This includes, but is not limited to, the identifications from Walker and Clarence Moss of Appellant as the actor who

_____

[4] We acknowledge that Appellant was never charged or convicted of any crime related to intimidating Kennedy as a witness, nor did Kennedy explicitly ever accuse Appellant of engaging in such behavior in these proceedings.

yelled "task force," and specific recollections of his street name of "Hoagie" and knowledge of him within the neighborhood. We note that Walker mistakenly indicated that someone other than Lee Smith was involved in the crime during a photo array, a fact that no doubt held great sway over the jury. And while both Walker and Clarence Moss had at least seen Appellant within the neighborhood in the weeks leading up to the shooting, there was no indication this was true as to Smith.

Finally, we accept that if Attorney Floyd had access to the Robichaw Statement and information from the material witness bond hearing, he could have provided more concrete cross-examination of Kennedy as to the allegations that police threatened him to testify against Appellant. Nonetheless, the PCRA court found that Kennedy's accusations were unbelievable. It also credited the testimony of Detective Vivarina dispelling Kennedy's claims. As the judge in the position to see the demeanor and presentation of the witnesses, we defer to the court's findings in this regard. **See**, **e.g.**, **Commonwealth v. Johnson**, 966 A.2d 523, 539 (Pa.Super. 2009) (stating that a PCRA court's "credibility determinations should be provided great deference by reviewing courts" and that "one of the primary reasons PCRA hearings are held in the first place is so that credibility determinations can be made").[5] We also perceive that Kennedy's purported fear of law

_____

[5] The amicus brief from the Law Enforcement Action Partnership and the National Police Accountability Project offered significant discussion relating to
*(Footnote Continued Next Page)*

enforcement, if presented at trial, could have also been undercut at least in part by rebuttal testimony that Kennedy, not detectives, was asserting death threats during his interviews with law enforcement.

In short, while there was doubtless relevant information the trial counsel missed by failing to attend Kennedy's material witness bond hearing, as well as the Commonwealth's failure to disclose the Robichaw Statement, Appellant simply has not demonstrated the requisite prejudice or materiality as to these claims.

E. Counsel's failure to investigate Andre Edmonds

In his next issue, Appellant challenges the efficacy of trial counsel because he did not investigate potential rebuttal witness Andre Edmonds. *See* Appellant's brief at 49-56.

Edmonds testified at the PCRA evidentiary hearing that on the night of the shooting, he was at 2538 West Turner Street with Kennedy, Robichaw, and another individual named Neil Ransome, among many others who resided in the three-story house. He claimed that he was up until the early morning hours of the following day taking care of his newborn daughter on the second

_____

coercion methods of the Philadelphia Police Department in the late 1980s and early 1990s. It specifically contends that the intimidation complained of by Kennedy was similar in nature to that commonly utilized by the department during that era. *See*, *e.g.*, brief of amici curiae at 19-25. While we acknowledge the organization for its thoughtful and detailed insight into this important issue, we nevertheless reiterate that the PCRA court was able to assess the credibility of multiple individual witnesses, including Detective Vivarina, in ascertaining the veracity of the underlying accusations.

floor, and that Appellant never came to the residence, contrary to Kennedy's statement to police. Edmonds also attested that before trial, he attempted to contact Appellant's trial lawyer, but never heard back.[6] He further offered that if he had been called to trial, he would have testified in accordance with the above.

Edmonds also spoke to an affidavit that he prepared in 1996, approximately three and one-half years after the shooting and nearly two years after trial. *See* N.T. Hearing, 9/11/23, at Defense Exhibit 15. The content of the affidavit was generally consistent with his testimony at the PCRA evidentiary hearing, though it was different in some respects. In the affidavit, he stated that he was required to force Robichaw and another person out of the house for being too loud on the night of the shooting. He additionally claimed that most people in the house were high from ingesting drugs that they procured that same evening. Edmonds declared that Appellant did not come to the house after the shooting. Contrary to his testimony of the PCRA hearing, the affidavit stated that Edmonds directly communicated with Appellant's trial counsel about the information contained therein, but that counsel appeared to have no interest in speaking with him.

The PCRA court found that Appellant's claim of ineffective assistance of counsel for failing to investigate Edmonds could not succeed because Appellant failed to prove adequate prejudice. Particularly, the court deemed

_____

[6] Edmonds was incarcerated at the time and utilized his family to make those communication attempts. *See* N.T. Evidentiary Hearing, 9/12/23, at 11.

Edmonds incredible. *See* PCRA Court Opinion, 8/13/24, at 19. It stated: "The gravamen of his testimony, that he could recall the details of numerous people coming and going from a three-story house while he was taking care of his infant daughter, on an otherwise 'normal night' – was not believable." *Id*. It also noted without significant discussion that Edmonds's testimony at the hearing had substantial inconsistencies with what was written in his 1996 affidavit. *Id*.

To the contrary, Appellant argues that had Edmonds "testified at trial in 1994, [he] would have provided valuable testimony to impeach prosecution witness Nemo Kennedy's . . . testimony and original statement to police, which alleged that [Appellant] confessed to Johnny Moss's murder." Appellant's brief at 50. Appellant contends that the PCRA court's finding of incredibility is belied by the record, highlighting that Edmonds likely had strong recollection of the night in question because he testified that some of the residents were "acting out" and that was close in time to the murder of a neighbor. *Id*. at 52-53. Appellant avers that the core of what Edmonds stated was consistent and that the PCRA court's reliance on minor inconsistencies was not justified. *Id*. at 53. He maintains that the court's adverse credibility determination relies upon the passage of time between the night of the murder and the PCRA hearing, for which Appellant was not responsible. *Id*. at 54-55. Appellant furthermore asserts that the failure to investigate Edmonds, beyond merely the failure to call him as a witness, constituted ineffectiveness because had trial counsel

simply spoken with Edmonds before trial, it would have led to additional investigatory avenues, such as to Renaldo Robichaw. *Id*. at 55-56.

The Commonwealth counters with its view that the PCRA court's credibility determinations are supported by the record. It notes that during his testimony at the evidentiary hearing, Edmonds stated that many people came and went throughout the house every night, including Appellant several times a week. *See* Commonwealth's brief at 59. At no point did Edmonds say that the evening of the shooting was memorable so many years later because it was close in time to a murder that he later learned about. *Id*. at 60. The Commonwealth disputes that the PCRA court was using the passage of time inequitably against Appellant, noting instead that Edmonds's testimony was implausible on its face and stressing that even the 1996 affidavit was created three and one-half years after the murder. *Id*. at 60-61.

With respect to this issue, we find that the PCRA court's credibility findings are upheld by the certified record. In other words, there is adequate support for the court's determination that Edmonds's testimony at the hearing was incredible. Appellant presumes that Edmonds had a good reason to remember the night of December 12, 1992, since Appellant was later convicted of a murder occurring that evening, but this presumption was not established through any evidence. Despite being asked in several ways what helped Edmonds recall that particular night, his answers confirmed that it was

largely a usual period and indistinguishable from many others where large groups of people came and went.

Furthermore, Edmonds's assurance that Appellant never came to the residence that evening rested solely on his opinion that he would have heard or seen him, despite acknowledging that others were being rowdy and loud and that he spent the vast majority of the time on a different floor taking care of a newborn. We also agree that there is a significant discrepancy between Edmonds's 1996 affidavit and his testimony at the PCRA evidentiary hearing, namely the details and circumstances surrounding his purported attempts at communicating with Appellant's trial counsel prior to trial. In one instance, he contended that he actually communicated with the attorney, who showed little interest. On the other hand, at the hearing he claimed that neither he nor his family was able to get in touch with Attorney Floyd.

Under these circumstances, we do not have the grounds to disturb the PCRA court's credibility determination. As it found, Edmonds's testimony would have provided little evidentiary benefit for Appellant had it been introduced at trial, since it would not have effectively impeached Kennedy, whose value to the Commonwealth primarily stemmed from a 1993 police statement. Assuming for the sake of argument that Edmonds's testimony at the evidentiary hearing was generally consistent with his affidavit from 1996, we note that the affidavit was created years after the shooting and trial, which casts doubt on Edmonds's ability to call into question Kennedy's statement to police occurring significantly closer in time to the murder.

Moreover, even if counsel had investigated Edmonds before trial and come to learn the significance of Renaldo Robichaw and his statement, that would not have led to a different outcome in the proceedings for the reasons discussed in more detail *supra*. Hence, we uphold the PCRA court's rulings on these claims.

F. Claims relating to the performance of appellate counsel

In his next two issues, Appellant lodges objections to the performance of Attorney Farrell, his appellate counsel. First, he avers that Attorney Farrell should have pursued a claim on direct appeal that the Commonwealth violated ***Bruton v. United States***, 391 U.S. 123 (1968), through testimony introduced by witness Latoya Singleton and the Commonwealth's subsequent "unmasking" of Appellant as the shooter during closing remarks. ***See*** Appellant's brief at 57-65. Relatedly, Appellant faults counsel for failing to argue a violation of ***Shields*** in this Court, insofar as the trial testimony necessary to adjudicate the ***Bruton*** claim is no longer available. ***Id***. at 65-72.

The Supreme Court of the United States has outlined the following pertinent history relating to ***Bruton***:

> In ***Bruton*** . . ., this Court recognized a narrow exception to the presumption that juries follow their instructions, holding that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even with a proper instruction. In ***Richardson v. Marsh***[, 481 U.S.

- 39 -

200 (1987)], the Court declined to extend **Bruton** further to confessions that do not name the defendant. [The Court] later qualified **Richardson** by holding that certain obviously redacted confessions might be "directly accusatory," and thus fall within **Bruton**'s rule, even if they did not specifically use a defendant's name.

Thus, the Court's precedents distinguish between confessions that directly implicate a defendant and those that do so indirectly.

**Samia v. U.S.**, 599 U.S. 635, 647-48 (2023) (cleaned up).

In **Shields**, our High Court held that "[i]n order to assure that a defendant's right to appeal will not be an empty, illusory right, we require that he or she be furnished a full transcript or other equivalent picture of the trial proceedings." **Shields**, 383 A.2d 844 at 846 (citation omitted). The Court added that "[m]eaningful appellate review is otherwise an impossibility, and fairness dictates that a new trial be granted." **Id**. (citation omitted). Since the appellant in that case, through no fault of his own, could not obtain access to a transcript that spoke to his appellate claims, the Court determined that he was entitled to new trial.

As additional context for these claims, we note that at trial, Latoya Singleton, a person familiar with both Appellant and co-defendant Lee Smith, testified on behalf of the Commonwealth. There is no dispute that the transcript from the morning of her testimony is lost and unavailable. Based on references made later in the Commonwealth's closing and in the trial court's Pa.R.A.P. 1925(a) opinion, it is apparent that she attested to a written statement she gave to police in 1993. **See** N.T. Hearing, 9/11/23, at Defense Exhibit 16. In that statement, she indicated that approximately one or two

days after the shooting, Smith told her that Appellant admitted to shooting the victim. The statement specifically referenced Appellant by his pseudonym of "Hoagie." Furthermore, it appears that Singleton was posed a question by Smith's counsel about the statement that would have implicated Appellant directly, and Appellant's counsel lodged an objection. Although the exact details of this exchange are now unknown, the trial court recalled in its Rule 1925(a) opinion that it sustained the objection and instructed the jury to disregard the **question** of counsel, suggesting that Singleton did not respond to the question.

The subject of Singleton's testimony resurfaced during the Commonwealth's closing argument. Therein, the prosecutor stated:

> Latoya Singleton testified that early morning hours right after the murder that Lee Lee[7] came back in the house at 1724 North 25th Street and he said, Lee Lee said, hey, I was out there and **those other guys did it**. I was out there, he says, but **those other guys did it**. . . . Maybe it is something else that we're talking about in terms of the quality of the mind or the character of the soul of the man who is so quick to try to silence a young girl or lay off part of his responsibility on a friend, associate, **or even a cousin** . . . but I think that an individual who would do such things as try and get a girl to keep her mouth shut and try to lay a little bit of blame off on somebody else **maybe even his own cousin**, might be lacking a little bit.

N.T. Trial, 6/15/94, 100-02 (emphases added). There is no dispute that during the trial, the jurors were informed that Appellant and Lee Smith were cousins.

_____

[7] Testimony indicated that this was a nickname for Lee Smith.

Appellant asserts that counsel was ineffective for abandoning preserved *Burton* and *Shields* claims on appeal. In particular, he cites U.S. Supreme Court caselaw for the proposition that it is error for a prosecutor to "undo the effect of a limiting instruction" of a statement that was redacted to comply with *Bruton*. **See** Appellant's brief at 59-60 (discussing *Richardson*). He contends that the statements of the assistant district attorney in this matter "intentionally and unequivocally implicated [Appellant] as the person referenced in co-defendant Lee Smith's statement to Latoya Singleton," namely by the allusion to their relationship as cousins. *Id*. at 60. In other words, he believes that whatever protections were made by the trial court with regard to *Brutonizing* Singelton's statement at trial were undone by the prosecution in closing. *Id*. at 62.

Within his brief, Appellant notes that the PCRA court relied upon *Commonwealth v. Brown*, 925 A.2d 147 (Pa. 2007) ("*Brown I*"), where our High Court concluded that particular comments by a prosecutor in closing did not violate *Bruton* if they "affected the redaction only indirectly and by inference and were not overly egregious." Appellant's brief at 62; *Brown I*, 925 A.2d at 160. However, he asserts that the Court of Appeals for the Third Circuit subsequently determined that *Brown I* was wrongly decided based on relevant law coming directly from the United States Supreme Court. **See** Appellant's brief at 62-63 (citing *Brown v. Superintendent Greene SCI*, 834 F.3d 506 (3d Cir. 2016). Appellant hence argues that the law stemming

from **Bruton** and its progeny, as articulated by the Supreme Court, "cannot be undone by decisions of the Pennsylvania Supreme Court[.]" **Id**. at 63.

As to the **Shields** claim, Appellant highlights that the transcript of Singelton's testimony is not recoverable and this oversight was not addressed by counsel in any prior Pa.R.A.P. 1923 statement of absence of transcript. **Id**. at 66. Without the testimony, Appellant protests, it cannot be known whether Singleton answered any question implicating Appellant as the shooter before the objection by counsel was lodged, and no jury instruction would have been sufficient to preserve Appellant's rights if that occurred. **Id**. at 67-68, 70. He attacks the PCRA court's reliance on statements of the prosecutor in closing to reconstruct Singleton's testimony, as these "do not provide a remotely equivalent picture to the full transcript." **Id**. at 68.

In addressing Appellant's **Bruton** assertion, the PCRA court referenced **Commonwealth v. Roney**, 79 A.3d 595, 629 (Pa. 2013), which cited **Brown I**, for the proposition that a violation only occurs when "the prosecutor discloses to the jury that the co-defendant's statement has been redacted and unequivocally identifies the defendant as the individual whose name was removed." PCRA Court Opinion, 8/13/24, at 23. The court found no evidence that the comments rose to such a level here. **Id**. at 24. It also noted that the trial court had given multiple instructions to the jury that a statement from one defendant to a third party cannot be used against a co-defendant and that statements of counsel do not constitute evidence. **Id**. at 24-25. In the court's

determination, this mitigated any prejudice arising from the assistant district attorney's comments.

The PCRA court similarly found that Appellant's ***Shields*** claim was meritless, since his issue concerning ***Bruton*** could be resolved by what existed in the record. ***Id***. at 22. It noted that during the Commonwealth's closing remarks, the prosecutor stated that "Laytoya [sic] Singleton testified that . . . Lee Lee said, hey, I was out there and those other guys did it . . ." ***Id***. at 22 (citing N.T. Trial, 6/15/94, at 100-02). The court opined that if the Commonwealth was permitted to utilize the statement that Singleton actually gave police, wherein she referenced Appellant directly by his street name of "Hoagie," it would have done so instead of generally referring to "those other guys." ***Id***. The court set forth the following additional analysis:

> Moreover, it is evident from [the trial court]'s opinion regarding an issue raised by [Appellant] in his post-verdict motion that . . . Singleton's testimony was ***Brutonized***. [The trial court]'s opinion indicates that [Lee] Smith's counsel directly asked . . . Singleton if . . . Smith had implicated [Appellant] in the shooting, [Attorney] Floyd objected, and Judge Fitzgerald sustained the objection. [The judge] instructed the jury to disregard the question, and further instructed the jury "several times" that questions of counsel were not evidence. Judge Fitzgerald would not have ruled in this manner if the jury had heard . . . Singleton say that Smith had said that "Hoagie . . . did it."

***Id***. at 22 (cleaned up).[8]

---

[8] In its brief, the Commonwealth agrees with the PCRA court on a general level that there was no ***Bruton*** violation, but further maintains that Singleton's testimony at issue was not "testimonial," which is required for a
*(Footnote Continued Next Page)*

Again, we find no reversible error with the PCRA court's analysis as to these claims. Particularly, we agree that had counsel pursued the **Bruton** claim on direct appeal to this Court, it would not have garnered him relief. Pursuant to binding authority from our High Court in **Brown I**, which was in effect at the time Appellant's brief was filed, we would have concluded that there was no **Bruton** violation because the prosecutor's statement referring to a "cousin" shortly after discussing Singleton's statement did not plainly identify Appellant. Neither did the comment demonstrate that Appellant's name was redacted from Latoya Singleton's police statement. **See**, **e.g.**, **Commonwealth v. Cannon**, 22 A.3d 210, 219 (Pa. 2011) ("Thus, pursuant to **Brown** [**I**], a **Bruton** violation may arise when a prosecutor discloses to the jury that the co-defendant's statement has been redacted **and unequivocally identifies the defendant** as the individual whose name was removed." (emphasis added)).

Like the PCRA court, we do not find that the prosecution's two passing references to Smith's cousin were so egregious as to warrant extension of the **Bruton** rule to remarks that are not the testimony of a witness. **See Brown I**, 925 A.2d at 398-99. This is so especially in light of the multiple cautionary

_____

Confrontation Clause violation. **See** Commonwealth's brief at 73-78 (citing **Crawford v. Washington**, 541 U.S. 36 (2004)). Appellant counters, *inter alia*, that it would be inequitable to utilize precedent from 2004 against him when, by no wrongdoing, his appeal was not decided until 2013, nearly twenty years after conviction. **See** Appellant's reply brief at 21-24. Since we do not rely upon the Commonwealth's particular contention within this decision, we do not address it further.

instructions the trial court provided to the jury stressing that closing arguments are not evidence. When viewed in context, the assistant district attorney's comments constituted two fleeting moments in a lengthy closing that spanned forty-seven transcript pages. Thus, Attorney Farrell would not have succeeded in this claim if it had been included in Appellant's direct appeal.

Similarly, Appellant would not have fared better if counsel had pursued a ***Shields*** claim before this Court. We readily acknowledge that this case has lacked any semblance of orderly punctuality and has faced procedural missteps at nearly every level, for an unacceptable amount of time.[9] Had this Court access to Latoya Singleton's testimony at trial, we could more definitively gauge the quality of Appellant's ***Bruton*** claim insofar as his concern that her testimony at trial was not redacted and directly implicated Appellant as the shooter. Nevertheless, we align with the PCRA court in determining that various surviving portions of the record provide adequate insight to address the claim and would not have required a remand.

The trial court's Rule 1925(a) opinion speaks to sustaining an objection after Singleton was posed a question and specifically references a curative instruction for the jurors to disregard that specific **question**. This heavily

_____

[9] As discussed at length in the thoroughly researched and well-written amicus brief from Phillips Black, a nonprofit, public interest law practice, much of this delay is attributable to the various court-appointed attorneys for Appellant. Yet, the court system is not free from fault. That includes this Court, which could have done more to ensure a proper progression of Appellant's direct appeal throughout the 2000s.

supports the notion that Singleton did not answer the question before the objection was sustained, as the court otherwise would have provided and discussed an instruction about disregarding Singleton's **response**. Further, we find persuasive the court's observation that, during closing arguments, the Commonwealth appeared to carefully go out of its way to avoid using the name "Hoagie" when recapping Singleton's testimony. The remark would have been significantly stronger for the Commonwealth had it referenced verbatim, or close to it, Singleton's actual statement to police.

Although these sources are not the same as an existing transcript, we, unlike Appellant and amici, find what remains of the lengthy record to be an "equivalent picture of the trial proceedings" concerning this claim. ***See Shields***, 383 A.2d 844 at 846. By his argument, Appellant requests that we ignore the fact that the Commonwealth significantly watered down its closing to avoid directly referencing Appellant and that the trial court provided a thoughtful analysis of the issue confirming counsel's objection to the testimony of Singleton. We will not disregard reasonable inferences that undercut Appellant's position merely because they do not refute it to a mathematical certainty. Therefore, Appellant's claims lodged against the efficacy of appellate counsel fail.

G. Cumulative prejudice

In his remaining allegation on appeal, Appellant asserts that he is entitled to a new trial based upon the cumulative prejudice arising from the

various errors by counsel and the Commonwealth throughout these proceedings. *See* Appellant's brief at 89-94.

Our Supreme Court has recognized that "no number of failed [ineffectiveness] claims may collectively warrant relief if they fail to do so individually." *Johnson*, 966 A.2d at 532 (citation omitted). However, the Court clarified that this principle applies to claims that fail because of a lack of merit or arguable merit. *See Commonwealth v. Sattazahn*, 952 A.2d 640, 671 (Pa. 2008). On the other hand, when the failures of multiple claims are each grounded in lack of prejudice, "[the] cumulative prejudice from individual claims may be properly assessed in the aggregate." *Commonwealth v. Hutchinson*, 25 A.3d 277, 319 (Pa. 2011). Our High Court has also considered in this analysis allegations of constitutional errors, such as *Brady*. *See Commonwealth v. Lesko*, 15 A.3d 345, 417 (Pa. 2011).

Appellant highlights the following claims of ineffectiveness and *Brady* violations that the PCRA court determined lacked prejudice: trial counsel's failure to impeach Kennedy with the Robichaw Statement; counsel's decision not to remain at Kennedy's material witness bond hearing; the inadequate objections to Walker's in-court identification; counsel's choice not to obtain and utilize hospital records supporting Appellant's alibi defense; his attorney's opting not to investigate potential rebuttal witness Edmonds; and the Commonwealth's oversight in not providing the handwritten police note as to

Walker's observations the night of the shooting.[10]  *See* Appellant's brief at 90.

He accuses the PCRA court of performing a brief and inadequate analysis as

to this claim.  *Id*. at 91.  Appellant argues:

> [The prosecution] failed to disclose evidence that corroborated [Appellant]'s alibi, contradicted an already suspect witness identification, and cast doubt on the fundamental integrity of police investigation in the case.  But for trial counsel's ineffectiveness in this case, [Appellant]'s jury would have encountered objective corroboration of his alibi defense.  [It] would have learned that . . . Nemo Kennedy was coerced into testifying [by law enforcement], and heard from Andre Edmonds that [Appellant] did not come to Kennedy's house on the night in question.  [It] would not have been exposed to a profoundly unreliable identification by Walker Moss.  The Commonwealth's suppression of evidence and the failures of [Appellant]'s trial counsel weakened both the credibility of [Appellant]'s alibi witness and his ability to counter the Commonwealth's shoddy evidence against him.  The prejudice of these omissions cannot be viewed in isolation.  Viewed individually and cumulatively, as they must, the many errors at [Appellant]'s initial trial and on appeal merit relief.

*Id*. at 91-92.  Furthermore, Appellant points to the fact that Lee Smith was

acquitted of all charges, something he avers the PCRA court glossed over, and

that Appellant's own conviction was for second-degree murder, which likely

was a compromise verdict from the jurors based on a weak presentation from

the Commonwealth.  *Id*. at 92-93.  He concludes:  "There can be no

---

[10] To the extent that Appellant also includes his allegations of appellate counsel ineffectiveness, we do not consider them in weighing whether there was sufficient cumulative prejudice creating a reasonable possibility that the verdict of trial would have been different.  By necessity, appellate counsel's failure to pursue claims on appeal could not have affected the jury's verdict directly.  Moreover, we considered jointly the claims asserted against appellate counsel above, and concluded that even together, they would not have warranted appellate relief from this Court.

confidence in the outcome of a trial riddled with so many Constitutional errors. This Court has an opportunity to rectify over [thirty] years of wrongs suffered by [Appellant] — an opportunity which it was previously denied due to ineffective appellate counsel. Appellant's conviction must be overturned." *Id*. at 94.[11]

In contrast to the PCRA court's terse assessment of this claim, the Commonwealth offers multiple points as to why it believes Appellant's argument fails. It works from the starting point of "imagin[ing] a trial where all allegedly suppressed evidence was disclosed to defense counsel, and where defense counsel behaved in all the ways that would have cured his alleged deficiencies, according to [Appellant]." Commonwealth's brief at 84. The Commonwealth avers that several pieces of information would not be included in the analysis due to the PCRA court's finding of a lack of arguable merit instead of prejudice, including counsel's failure to make unmeritorious arguments challenging Walker's in-court identification, seek out Jean's hospital records, or pursue a *Bruton* claim on appeal. *Id*. at 84. With what remains, the Commonwealth

> assumes a trial where defense counsel had attempted to impeach Nemo Kennedy with Kennedy's testimony from his bond hearing, with [the Robichaw Statement], and with testimony by Andre

_____

[11] The amicus brief from Phillips Black discusses at length the frequent inadequacy of representation by court-appointed counsel in Pennsylvania, particularly in capital cases, where the prevalent fee structure disincentivizes thoroughness and creative argument. Since that specific issue is not before us, we do not weigh the wisdom of policies set by the various counties as enforced by the courts of common pleas.

Edmonds. It also assumes that the Commonwealth turned over the handwritten note in the homicide file, concerning the early police interaction with Walker . . . on the night of the incident. Under these imagined alterations to the trial, confidence in the outcome is not undermined.

*Id*. at 84-85 (some capitalization altered).

In its brief, the Commonwealth concedes that Kennedy's credibility could have suffered if he was impeached with information gleaned from his material witness bond hearing, but that none of it would have cast doubt on his original statement to police in 1993, which ultimately ended up forming the crux of his evidence against Appellant. *Id*. at 85. It additionally argues that even if the Robichaw Statement were to bolster Kennedy's later recantation, the weak and vague testimony of police coercion would not have held up because Appellant's defense investigator testified that Kennedy ultimately did not deny the accuracy of his statement to police.[12] *Id*. at 85-86. The Commonwealth views less significantly than Appellant the fact that Smith was acquitted, discussing that there was substantially different evidence against the co-defendant, who was asserted to be less culpable than Appellant and who was not identified correctly by Walker or Clarence Moss prior to trial. *Id*. at 87.

While perhaps Appellant's most robust argument on appeal, we nevertheless find that his claim does not warrant reversal of the PCRA court.

_____

[12] Appellant disputes this in his reply brief, arguing that the Commonwealth's interpretation of the testimony "borders on bad faith" and "rests on an implausible reading of a confused line of testimony." Appellant's reply brief at 9-10. Since we resolve this contention based on other bases, we do not adopt the Commonwealth's particular argument in this respect.

Unlike the Commonwealth, we conclude that **all** of Appellant's claims before the PCRA court failed based on a lack of prejudice. Accordingly, we consider this issue in the same light as proposed by Appellant in his brief.

Viewing the additional evidence in the aggregate, we are not persuaded that the errors by counsel, or related **Brady** violations by the Commonwealth, "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." **Sandusky**, 203 A.3d at 1043. Further argument as to Walker's in-court identification would not have compelled the trial court to preclude the same, especially since it allowed Walker and Clarence Moss to identify Lee Smith in court, despite them making prior mistakes in identification as to him. Next, had Walker been impeached with the police note about not "knowing" the perpetrators, this would have merely reiterated that he did not identify "Hoagie" by name the night of the murder, something argued by the defense at trial. **See**, **e.g.**, N.T. Trial, 6/15/94, at 53 (recounting that on the evening of the murder, Walker only indicated that he could "probably" identify the person who did the shooting). Additionally, if counsel had access to Jean's hospital records surrounding the birth of her child, this would not have offered any significant support to Appellant's purported alibi, when the crimes occurred half a day later and when the alibi took almost eighteen months to surface.

Furthermore, as analyzed in closer detail above, we recognize that information learned during Kennedy's material witness bond hearing, including the existence of the Robichaw Statement, certainly could have been

used to further impeach Kennedy during trial. Yet, Kennedy's value to the prosecution came through introduction of his statement to police in 1993, which was given well before the Robichaw Statement, recantation, or testimony at the material witness bond hearing. Based on the credibility determinations made by the PCRA court, which were supported by the record, Kennedy's allegations of undue police coercion were incredible and could have been rebutted with force by the Commonwealth at trial, particularly through Detective Vivarina.

Finally, had Andre Edmonds been called to further dismantle Kennedy's account, his questionable story, which the PCRA court found implausible, does not erode our confidence in the verdict. At best, it would have indicated that Edmonds did not see or hear Appellant at the residence on the night of the shooting, despite him staying on another floor, the house containing many rowdy and loud participants, and his preoccupation with watching his newborn daughter.

Had trial proceeded under these circumstances, we do not find the chance of a different jury verdict to be reasonably probable. Stated another way, this Court is confident that the outcome of the trial Appellant claims he should have had would have been the same as the one he, in fact, underwent. While Appellant's trial counsel seemingly failed to explore certain opportunities for further impeachment of Commonwealth witnesses, we reiterate that Appellant was entitled to constitutionally effect counsel and a fair trial, not perfection. *See Strickland*, 466 U.S. at 689; *Wright*, 961 A.2d at 135.

In short, we determine that Appellant has not met his burden with respect to his multiple claims on ineffective assistance of counsel or the Commonwealth's violations of **Brady**. Accordingly, we have no cause to disturb the PCRA court's order dismissing Appellant petition.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/24/2025